# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ARIZONA, STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF OREGON, and STATE OF WYOMING, | Case No.: 3:24-cv-00347-AN |
| Plaintiffs, | OPINION & ORDER |
| v. | |
| KROGER COMPANY and ALBERTSONS COMPANIES, INC., | |
| Defendants. | |

Plaintiffs Federal Trade Commission ("FTC"), the District of Columbia, and the States of Arizona, California, Illinois, Maryland, Nevada, New Mexico, Oregon, and Wyoming bring this action pursuant to the Federal Trade Commission Act, 15 U.S.C. § 53(b), and the Clayton Act, 15 U.S.C. § 26, against defendants Kroger Company ("Kroger") and Albertsons Companies, Inc. ("Albertsons"), seeking to enjoin a proposed merger of the two companies.

The Court held a fifteen-day preliminary injunction hearing beginning on August 26, 2024. After careful consideration of the record and the parties' arguments, and for the reasons that follow, the motion for preliminary injunction is GRANTED.

## LEGAL STANDARDS

### A.    Section 7 of the Clayton Act

Section 7 of the Clayton Act prohibits any merger or acquisition "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Section 7 is "intended to reach incipient monopolies and trade restraints" at the outset. *Brown Shoe Co. v. United States*,

1

370 U.S. 294, 318 n.32 (1962). Section 7 requires a "showing of reasonable probability of anticompetitive effect." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (citation omitted).

## B.     Section 13(b) Standard for Preliminary Injunctions

Section 13(b) of the Federal Trade Commission Act ("FTC Act") authorizes a district court to preliminarily enjoin a merger or acquisition, pending the FTC's administrative adjudication, when the FTC has reason to believe that a person or entity is about to violate any provision of law enforced by the FTC and an injunction would be in the interest of the public. 15 U.S.C. § 53(b). To obtain an injunction, the government must show a likelihood of success on the merits and establish that the equities favor injunctive relief. *Warner*, 742 F.2d at 1160. The court is not asked "to make a final determination on whether the proposed merger violates Section 7, but rather to make only a preliminary assessment of the merger's impact on competition." *Id.* at 1162. The government meets its burden if it "'raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.'" *Id.* (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 698 (8th Cir. 1979)).

Defendants argue that the Court should use the four-part preliminary injunction test articulated in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and commonly employed outside the antitrust context, rather than the test laid out in 15 U.S.C. § 53(b). Defs. Resp. Brief ("Defs. Resp."), ECF [234], at 14 (citing *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024)). The *Winter* test imposes a higher burden, requiring plaintiffs to show that they are likely to suffer irreparable harm in the absence of a preliminary injunction in addition to a likelihood of success on the merits and that the equities weigh in their favor. In *Starbucks*, the Supreme Court held that courts must apply the four-part *Winter* test when considering a motion for a preliminary injunction filed pursuant to section 10(j) of the National Labor Relations Act ("NLRA"). 602 U.S. at 345. Defendants argue that the same holding should apply to section 13(b) of the FTC Act.

The NLRA empowers the National Labor Relations Board ("NLRB") to move for a preliminary injunction and gives the district courts jurisdiction "to grant to the Board such temporary relief

or restraining order as it deems just and proper." 29 U.S.C. § 160(j). The Supreme Court presumed that, absent any statement otherwise in the text of section 10(j) of the NLRA, Congress intended for the courts to apply the "traditional" four-part test. *Starbucks*, 602 U.S. at 346-47.

Section 13(b) of the FTC Act, unlike section 10(j) of the NLRA, does explicitly modify the traditional equitable criteria by listing the proper criteria courts must consider, namely, whether "weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." Courts have consistently applied these criteria, rather than the *Winter* test, in antitrust cases for decades. "The Congress intended this [Section 13(b)] standard to depart from what it regarded as the then-traditional equity standard, which it characterized as requiring the plaintiff to show: (1) irreparable damage, (2) probability of success on the merits and (3) a balance of equities favoring the plaintiff." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (citing H.R. Rep. No. 93-624, at 31 (1971)); *see also FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) ("In enacting this law, Congress further demonstrated its concern that injunctive relief be broadly available to the FTC by incorporating a unique 'public interest' standard in 15 U.S.C. § 53(b), rather than the more stringent, traditional 'equity' standard for injunctive relief."). Given the plain text of Section 13(b), and absent any higher court interpretation of Section 13(b) to the contrary, the Court finds this argument to be without merit and will not alter the preliminary injunction standard.

## C.  *Baker Hughes* Burden-Shifting Framework

To determine the likelihood of success on the merits, courts apply a burden-shifting framework promulgated in *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990). Under the *Baker Hughes* framework, the government bears the initial burden of making a *prima facie* case that "a transaction will lead to undue concentration in the market for a particular product in a particular geographic area." *Baker Hughes*, 908 F.2d at 982. This creates a presumption that the merger will substantially lessen competition. *Id.*

The burden then shifts to the defendants to rebut the presumption. *Id.* "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *Id.*

3

at 991.  If the defendants successfully rebut the presumption, the burden then shifts back to the government to produce additional evidence of anticompetitive effects.  *Id.* at 983.  The ultimate burden of persuasion is with the government at all times.  *Id.*

## BACKGROUND

### A.    The Parties

Kroger was founded in 1883 and operates approximately 2,700 stores across thirty-five states and the District of Columbia.  PX6009 at 112-113.  It comprises over twenty distinct "banners," or store brands, including King Soopers, QFC, Fred Meyer, Ralphs, Fry's, Mariano's, and Harris Teeter.  *See* Pls. Mot. for Prelim. Inj. ("Pls. Mot."), ECF [204], App. A.  Kroger stores are spread across the country but are clustered primarily in the Midwest, Southeast, and Southern California.  Kroger describes itself as "the nation's largest grocer" and is the largest employer of union grocery workers.  PX6030 at 001.  Kroger operates approximately thirty-five manufacturing facilities where it produces about forty percent of its in-house, or "private label," items.  *Id.* at 003.  In addition to its grocery stores, Kroger operates approximately 2,252 pharmacies and 1,637 fuel centers.  PX6009 at 113.  It employes approximately 430,000 people, of which approximately sixty-five percent are union workers covered by collective bargaining agreements ("CBAs").  *Id.* at 115-116.

Kroger has expanded over time through a series of mergers.  In 1983, Kroger merged with Dillon Companies Inc. and acquired the Dillon's, King Soopers, Fry's, City Market, and Gerbes grocery banners.  In 1999, Kroger merged with Fred Meyer, Inc., through which it also acquired the Smith's, Ralphs, Food 4 Less, and QFC banners, and separately acquired JayC, Owens Market, and Pay Less.  In 2001, it merged with Baker's; in 2014, Harris Teeter; and in 2015, Pick 'N Save, Metro Markets, and Mariano's.  PX6030 at 007.

Albertsons was founded in 1939 and operates approximately 2,269 stores across thirty-four states and the District of Columbia.  PX6153 at 008.  Its approximately twenty banners include Safeway, Vons, Jewel Osco, Shaw's, Haggen, Star Market, and Tom Thumb.  Pls. Mot., App. A.  Albertsons stores are spread across the country but are located primarily in the Northeast, West Coast, and Mountain West

4

regions. It is the second-largest employer of union grocery workers. PX7004 ¶ 247; PX2315 at 011. In addition to its grocery stores, Albertsons operates approximately 1,725 pharmacies and 402 fuel centers. PX6153 at 008. Albertsons operates approximately nineteen manufacturing facilities, which produce approximately ten percent of its private label brands. *Id.* at 008-009. It employs approximately 285,000 people, of which approximately 200,000 are union workers covered by CBAs. *Id.* at 010.

Albertsons has also grown through acquisitions. Most recently, in 2015, it acquired Safeway in a deal that involved a divestiture of 146 stores to Haggen, a small grocery retailer operating in Oregon and Washington. PX7004 ¶ 232. Haggen subsequently sold twenty-seven stores and filed for bankruptcy. Albertsons reacquired fifty-four of the divested stores as part of an agreement to purchase Haggen. *Id.* ¶ 236.

Defendants' businesses have many similarities. Their stores sell an extensive variety of food items, including fresh products and non-perishables, as well as household goods. These individual items are referred to in the industry as stock keeping units ("SKUs"). *See, e.g.*, Prelim. Inj. Hr'g Tr. ("Tr.") 165:4-10 (Van Helden). As part of this offering, defendants' stores include full-service departments such as a meat counter, deli, florist, sushi, and bakery.

Defendants offer a mix of nationally recognized brands, such as Kraft and Pepsi, as well as exclusive, in-house brands, which the parties alternately referred to as "private label," "own," or "store" brands. Kroger, for example, offers private label brands like Kroger, Simple Truth, and Private Selection, while Albertsons offers brands such as Signature Select, O Organics, Open Nature, and Lucerne. Private label brands offer a lower-cost alternative to national brands that require less marketing and capture a higher profit margin. Tr. 167:11-21 (Van Helden). Private label brands are generally exclusive to and associated with a particular banner. PX7004 ¶¶ 54-55; Tr. 383:21-384:16 (Neal); 478:6-21 (Kammeyer).

Both businesses have loyalty programs and reach customers through a variety of advertising methods, ranging from printed ad circulars to targeted digital advertising. Defendants utilize customer data to establish "alternative profit" streams. Tr. 2247:18-20 (Cossett). A major alternative profit stream that both defendants emphasized is the "retail media network," through which retailers sell

marketing and advertising opportunities in their stores and websites. *Id.* at 1023:18-1023:4 (McGowen). Kroger has an internal data analytics and marketing arm, which it refers to as "84.51." *Id.* at 1802:5-12 (Aitken). Albertsons offers Albertsons Media Collective, a "robust digital marketing platform that reaches [its] extensive customer network and leverages [its] strong market share." PX6153 at 010.

Both companies monitor and "price check" against competitors, collecting data from digital services, scanning flyers and advertisements, or even walking through a physical store to compare prices on SKUs. *See, e.g.*, Tr. 223:2-13 (Silva). The collected information is used to adjust prices on individual SKUs to more effectively compete. The parties most frequently mentioned digital price checks, for which defendants use a vendor that scrapes a competitor's website to collect price data. *See, e.g.*, *id.* at 249:25-250:9 (Silva). A price check can be against an individual item or subset of items, or it can be a "full book" check against a competitor's entire inventory. *Id.*

## B. The Proposed Merger and Divestiture

Albertsons made public that it was interested in pursuing a merger in February 2022. Tr. 1721:2-17 (Sankaran). On October 14, 2022, defendants announced their intent to merge via Kroger's acquisition of Albertsons for approximately $24.6 billion. PX6084 at 2; *see* DX2552. The parties testified that the merger was intended to create "national coverage" by combining their existing geographic range and increasing their scale such that they could compete against mass retailers such as Walmart, Amazon, and Costco. Tr. 1609:21-23, 1722:13-22 (Sankaran).

As part of the proposed merger, defendants agreed to sell some stores to a divestiture buyer, C&S Wholesale Grocers, LLC ("C&S"). C&S emerged as the divestiture buyer after a competitive bidding process conducted by defendants. DX0813 at 3. As its name suggests, C&S is a wholesaler that provides grocery products to retail grocery stores. It is a privately held company owned by the Cohen family and headquartered in New Hampshire. Tr. 1159:3-9 (Winn). It supplies approximately 7,500 grocery retail stores and employs about 14,000 people. *Id.* at 1209:13-22 (Winn).

C&S has dipped its toes into the grocery retail industry before. Between 2001 and 2003, C&S purchased approximately 220 Grand Union, A&P, and SuperValu stores. Tr. 1162:10-12 (Winn). By

2005 it had sold approximately 190 of those stores.  *Id.* at 1162:13-15 (Winn).  In 2005, C&S purchased 105 stores from Bi-Lo and Winn Dixie.  *Id.* at 1162:16-18 (Winn).  Those stores were converted to the Southern Family Markets banner.  Approximately fifty of them had closed by 2006.  *Id.* at 1162:19-1163:1 (Winn).  C&S chose to exit the grocery retail market in 2012, selling all but three of its remaining stores. *Id.* at 1163:18-19 (Winn).

C&S' chief executive officer testified that the company began considering reentering the grocery retail business after losing one of its largest customers, Ahold Delhaize, in 2019.  *Id.* at 1223:35-5. In 2021, C&S acquired approximately a dozen Piggly Wiggly stores.  Most recently, in February 2022, C&S purchased twelve stores that were divested as part of the Price Chopper/Tops merger.  *Id.* at 993:19-994:6 (McGowan).  Those stores were rebannered to become Grand Union stores.  As of the date of the preliminary injunction hearing, C&S operated either twenty-three or twenty-five retail stores, split between the Piggly Wiggly and Grand Union banners.  Tr. 990:18-24 (McGowan); 1173:24-25 (Winn).  Within its grocery retail business, C&S operates one pharmacy and no fuel centers.  *Id.* at 1019:24-1020-16 (McGowan).  It maintains separate divisions for its retail and wholesale organizations.  *Id.* at 990:4-6 (McGowan).

C&S was first announced as a divestiture buyer on September 8, 2023.  After plaintiffs initiated this case, defendants and C&S entered into an amended Asset Purchase Agreement ("APA").  *See* DX2238.   Under the APA, C&S will receive 579 stores from both Kroger and Albertsons across approximately thirty states and the District of Columbia.  Tr 1170:18-22 (Winn).  The divestiture is not a straightforward conveyance of a single banner or brand.  Instead, the amended agreement includes ninety-six stores from Kroger and 483 stores from Albertsons, transfers ownership of some banners, and licenses the right to use other banners.  *Id.* at 1171:7-13 (Winn).  In addition to the 579 stores, the divestiture package includes six distribution centers; ownership of the Carr's, QFC, Haggen, and Mariano's banners; licenses to use the Albertsons banner in California and Wyoming and the Safeway banner in Colorado and Arizona; ownership of the Open Nature, Waterfront Bistro, Debi Lilly Design, ReadyMeals, and Primo Taglio private label brands; temporary license to use the Signature and O Organics private label brands; and a

dairy manufacturing plant in Colorado. DX2238 at 40-43, 174; PX7002 ¶ 8; Tr. 2413:3-6; 2417:4-6 (Cosset). Defendants and C&S entered into a Transition Services Agreement ("TSA") that memorializes the terms governing the transferred assets and grants C&S the right to use certain of defendants' services, technology, and data during a limited transitional period. *See* DX2238, Ex. B.

### C. Procedural History

On February 26, 2024, after a civil investigation, the FTC initiated Part 3 administrative proceedings before an administrative law judge. That same day, plaintiffs filed the complaint in this action, seeking to enjoin the proposed merger pending the outcome of the administrative proceedings. The parties stipulated to a temporary restraining order under which defendants shall not consummate the merger until five days after this order. Order of February 27, 2024, ECF [14].

The Court held a preliminary injunction hearing from August 26 through September 17, 2024. Ten days after conclusion of the hearing, on September 27, the parties submitted proposed findings of fact and conclusions of law.

## DISCUSSION

### A. Preliminary Evidentiary Issues

The parties exchanged a prodigious amount of evidence during the expedited discovery period. Although the parties admirably cooperated and resolved many discovery and evidentiary issues without the Court's intervention, one must be addressed at the outset of this opinion and order.

Based on a prior stipulation that each party could "seek to offer into evidence a reasonable number of exhibits" in support of its proposed findings of fact, Stip. & Order Regarding the Scope of the R., ECF [413], plaintiffs offered an additional 119 exhibits, Pls. Br. Regarding Post-Hr'ing Exs., ECF [484]. Defendants do not object to five of those exhibits, and they are received into evidence. Defendants object to the remaining 114 exhibits, primarily because they assert the exhibits are hearsay or do not have a sponsoring witness.

The Federal Rules of Evidence do not strictly apply to preliminary injunction hearings. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted

on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."). The court may consider, for example, hearsay or other inadmissible evidence. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (citation omitted). The fact that evidence may not meet the formal criteria for trial should go to the weight accorded to it. *FTC v. CCC Holdings Inc.*, No. CV 08-2043 (RMC), 2009 WL 10631282, at *1 (D.D.C. Jan. 30, 2009).

The Court is not prohibited from receiving hearsay or documents without a sponsoring witness after the conclusion of the hearing. The fact that a document is hearsay or was not contextualized by a sponsoring witness goes to the weight and reliability accorded to the evidence. The Court finds, however, that the additional exhibits are simply unnecessary. The parties sought to admit many exhibits during the preliminary injunction hearing and created a large, comprehensive record that was sufficient for the Court to render an opinion on the motion for preliminary injunction. Accordingly, the Court does not admit the disputed post-hearing exhibits at this time. Should plaintiffs wish to admit these exhibits at a later stage of proceedings, the Court will consider a second motion.

**B.      Consumer Markets**

Plaintiffs assert that the proposed merger will substantially lessen competition and result in harm to consumers and to workers. The Court addresses each argument in turn.

First, plaintiffs allege that the proposed merger will substantially lessen competition within two distinct markets, supermarkets and large format stores, in the local areas around defendants' existing stores. Defendants dispute the proposed market definition and deny that the proposed merger will substantially lessen competition amongst grocery retailers where defendants operate.

*1.      Market Definition*

The first step of antitrust analysis is to define the relevant market. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). The relevant market has two components: the product market and the geographic market. *Brown Shoe*, 370 U.S. at 324. The parties disagree on the proper boundaries of both components.

a.     Product Market

i.     *Legal Standard*

The relevant product market is determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Id.* at 325. "Interchangeability of use and cross-elasticity of demand look to the availability of substitute commodities, i.e. whether there are other products offered to consumers which are similar in character or use to the product or products in question, as well as how far buyers will go to substitute one commodity for another." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) ("*Staples I*") (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956)).  In plain terms, the relevant market consists of what customers consider to be reasonable substitutes for a company's products.  Markets should be drawn narrowly, excluding even "functionally interchangeable" products that can be used for the same purpose, if "only a limited number of buyers will turn" to them.  *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (quoting *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).  Courts may look at "both quantitative and qualitative evidence in defining the relevant product market."  *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 353 (S.D.N.Y. 2024).

Within a larger market, submarkets may exist which constitute product markets for antitrust purposes.  *Brown Shoe*, 370 U.S. at 325.  Courts routinely determine whether a well-defined submarket exists by "examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Id.*; *see, e.g., FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 118 (D.D.C. 2016) ("*Staples II*").  These practical indicia are often referred to as the "*Brown Shoe* indicia."  No single *Brown Shoe* indicium is dispositive, as "the determination of the relevant market in the end is 'a matter of business reality—[ ]of how the market is perceived by those who strive for profit in it.'"  *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998) (alteration in original) (quoting *FTC v. Coca–Cola Co.*, 641 F.Supp. 1128, 1132 (D.D.C.1986); *vacated as moot*, 829 F.2d 191 (D.C. Cir. 1987)).  Courts treat the *Brown Shoe* indicia as "evidentiary

10

proxies for direct proof of substitutability" and may use them to define the relevant product market. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27 (D.D.C. 2015) (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986)).

        ii.        The "Supermarkets" Market

Plaintiffs submit that the relevant product market is the submarket of "traditional supermarkets and supercenters," which they refer to collectively as "supermarkets." PX7004 ¶ 67. This includes traditional supermarkets like Kroger, Albertsons, Food Lion, Stater Bros., and Raley's. These stores, plaintiffs argue, have distinct characteristics, uses, customers, and other attributes that distinguish them from other retail businesses that sell some subset of the same grocery products. Defining features of supermarkets include the variety and depth of fresh and non-perishable food products and household goods, a "one-stop-shopping" experience, and size and brand selection, including both national and private label brands. Pls. Mot. 23-24. Plaintiffs argue that supermarkets have a distinct store layout that accounts for their relatively large number of SKUs and staffed departments such as a deli, bakery, or seafood, and offer a distinct customer experience with a greater customer service orientation and product displays. *Id.* at 25. Finally, plaintiffs argue that supermarkets offer a distinct pricing scheme and price primarily based on price checks against other supermarkets. *Id.* Supercenters like Walmart and Target, as larger format stores that offer the same variety of food products, brand options, price points, and one-stop shopping experience as traditional supermarkets, essentially "contain traditional supermarkets within their footprints," rendering them equivalent to traditional supermarkets for purposes of this analysis. Pls.' Proposed Findings of Fact & Conclusions of Law ("Pls. Proposed FOF & COL"), ECF [490], at 5.

Plaintiffs acknowledge that other grocery retailers exist but argue that they fall into separate categories that are differentiated from traditional supermarkets and supercenters. Natural and gourmet stores, like Whole Foods or Sprouts Farmers Market, sell specialty products with a focus on natural, organic, and local produce, health foods, nutritional supplements, and specialized dietary preferences. Club stores, like Costco or Sam's Club, are membership-based, generally operate out of large warehouse spaces, and offer a smaller selection of products in bulk package sizing at a discount. Limited assortment stores,

like Aldi, Lidl, and Trader Joe's, offer a smaller selection of brands and products, focused primarily on private label brands rather than national brands, and fewer staffed service counters, to offer a lower price point. Dollar stores sell a much smaller selection of food and grocery items, many non-grocery items, very limited or no fresh products, have a smaller store size, and, as the name suggests, generally offer products ranging in cost from one to five dollars. E-commerce retailers, like Amazon.com, offer products primarily through internet orders, either via pickup or delivery, offer a broad array of non-grocery items, and may charge a subscription fee for access or delivery. PX7004 ¶¶ 38-53, 96-99.

There is precedent to support a finding that submarkets exist within the larger category of grocery retailers. In *Federal Trade Commission v. Whole Foods Market, Inc.*, the Court of Appeals for the District of Columbia Circuit found that plaintiff properly defined the relevant submarket of "premium, natural, and organic stores" ("PNOS") which differentiated themselves from other grocery retailers through an appeal to customers' interest in organic, healthy, and ecologically sustainable products, a larger selection of natural and organic products, and a greater concentration of perishable products than conventional supermarkets. 548 F.3d 1028, 1039 (D.C. Cir. 2008). The court considered quantitative evidence that the merging parties competed directly with each other but competed with traditional grocery stores only "on the dry grocery items that were the fringes of their business," that PNOS retailers had a greater competitive effect on each other's prices than conventional grocery stores, and that consumer behavior and market research showed that customers expressed a preference to substitute with other PNOS stores. *Id.* at 1039-40.

The Court begins its analysis of whether the supermarket market is a relevant product market with the *Brown Shoe* indicia.

a.      Industry and Public Recognition

During the preliminary injunction hearing, the Court heard testimony that industry participants understand supermarkets to be a distinct submarket that includes Kroger and Albertsons banners. *See, e.g.,* Tr. 365:5-16 (Neal) (testifying that Kroger and Albertsons are considered "conventional grocers" or "conventional supermarkets" in the industry distinguished from "mass" retailers and the "natural

12

organic channel"); 163:13-18 (Van Helden) (explaining the industry term "traditional supermarket"); 171:2-20 (Van Helden) (describing Kroger and Albertsons as "traditional supermarkets"); 934:8-19 (Knopf); 2026:22-2027:5 (testifying that Costco refers to the "traditional grocery store" or "supermarket" store format internally); 2317:19-22 (Gafsi Oblisk).

Plaintiffs presented evidence that marketing and data analytics tools used by retailers treat supermarkets and other types of stores as distinct analytical categories. Numerous industry professionals referred to standardized categories of data reporting provided by vendors like Nielsen and Circana. These categories included a narrower "food and grocery" data stream, as well as a "MULO" ("multi outlet") stream that combines the "food and grocery" stream with data from Walmart and Target. *Id.* at 577:23-10 (Huntington); 909:12-18 (Curry). A newer data stream is the "MULO+" category, an "omni-channel" stream that "basically encompasses every competitor that sells groceries," with the "plus" representing the new addition of Amazon.com and Costco. *Id.* at 577:21-578:5 (Huntington). One Albertsons executive explained that MULO+ was relatively new and had only become available to the company about four to six months prior to the preliminary injunction hearing. *Id.* at 577:9-18 (Huntington).

b.    Peculiar Characteristics and Uses

Testimony throughout the hearing reflected that supermarkets have particular characteristics that distinguish them from other industry participants and that these characteristics attract a distinct customer. Supermarkets carry a wide variety of meat, produce, and other foods, have "the conventional departments that you would expect to see," and are defined by "the assortment of what they sell. . . . you find a lot of the conventional brands that are ubiquitous across the market . . . major brands." *Id.* at 365:23-366:19 (Neal). Albertsons offers a broad assortment of offerings to attract customers, including fresh produce, meat, a seafood counter, a deli counter, a bakery, a floral department, and general grocery offering national brands and private label brands. *Id.* at 519:10-521:15 (Huntington); *see also id.* at 417:13-420:19 (Marx) (testifying that Mariano's stores, a Kroger banner, have staffed deli, butcher, seafood counters, bakeries, Starbucks, pharmacy, florist, and a wide selection of groceries at multiple price points, for both national brands and private label products); 808:9-811:1 (Schwilke).

13

Industry professionals testified that a "traditional supermarket" approaches approximately 40,000 to 60,000 square feet in order to offer a "breadth of service departments" and an "assortment of items . . . that the customer would expect us to have*." Id.* at 163:13-18; 164:15-22 (Van Helden); 417:10-12 (Marx); 807:2-8 (Schwilke); 2193:22-24 (Yates) (testifying that Food Lion stores are "traditional supermarkets" ranging from 30,000 to 60,0000 square feet). That floor space is designed to accommodate the number of SKUs offered at a supermarket, usually between 30,000 and 60,000 SKUs. *Id.* at 164:23-165:3 (Van Helden); 371:13-17 (Neal); 518:23-519:7 (Huntington) (testifying that Albertsons stores generally carry about 40,000 SKUs); 807:19-21 (Schwilke) (testifying that Ralphs stores, a Kroger banner, generally carry about 50,000 SKUs).

### c. Distinct Customers

A set of customers that select for the particular attributes of a submarket can shape the relevant market and antitrust concerns. "[W]hen one or a few firms differentiate themselves by offering a particular package of goods or services, it is quite possible for there to be a central group of customers for whom 'only [that package] will do.'" *Whole Foods Mkt.*, 548 F.3d at 1038 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 574 (1966)). A recognizable submarket may exist because customers "need a complete cluster of products . . . because their particular circumstances dictate that a product is the only realistic choice . . . or because they find a particular product uniquely attractive." *Id.* at 1039 (citations and quotation marks omitted).

Plaintiffs presented evidence that supermarkets have their distinct characteristics in part to offer a particular shopping experience targeted toward customers that value "one-stop shopping," satisfying all of a customer's grocery needs in a single visit to one location. Grocery industry participants view the one-stop shop as catering to a particular customer need. *See, e.g.,* Tr. 163:19-164:11 (Van Helden) ("Well, the idea is that customers would choose to shop with a single retailer and do the bulk of their shopping at one time, and so that would mean that they would not only have to have all of the things that they want, all the services they want, but it would be a place or an environment where they would appreciate shopping at."); 372:19-22 (Neal) ("A primary shop is where a customer will go in and get everything that they need

14

– soup to nuts, top to bottom – such that they don't, in many cases, need to shop anywhere else for anything else.").

Kroger itself advertises one-stop shopping as an "innovation" available at its stores, "a complete shopping universe with endless variety, in-store dining, wine and cheese shops, sushi and even Starbucks" that "elevated one-stop shopping convenience to a new level." PX6030 at 002, 006. It believes that its primary store format is successful "because the stores are large enough to offer the specialty departments that customers desire for one-stop shopping, including natural food and organic sections, pharmacies, general merchandise, pet centers and high-quality perishables such as fresh seafood and organic produce." PX6009 at 113; *see also* Tr. 476:13-15 (Kammeyer) (testifying that customers can purchase all "household food and nonfood requirements" in one trip at Fred Meyer). Internal communications show that Albertsons shapes its offerings to attract the one-stop shopper. *See, e.g.*, PX12380 (email from Albertsons' chief executive officer stating "I'm very proud of our sustained, robust performance as we grow our market share and position as being a one-stop shop for consumers.").

Industry professionals testified that other types of stores are categorized separately based on their characteristics and do not offer a one-stop-shopping experience. Limited assortment stores like Aldi, for example, have low prices, "virtually no service," and a fraction of the SKUs of a traditional grocery store. A one-stop shopper would not find the same variety of products or service counters offering custom service and specialty items there. Tr. 170:14-25; 174:13-6 (Van Helden). Club stores are not traditional supermarkets because of their membership model, bulk package sizes, lack of service offerings, and limited number of SKUs. They do not appeal to a one-stop shopper who does not want to buy a limited selection of items in large bulk quantities. *Id.* at 172:12-174:12 (Van Helden). Dollar stores cannot substitute for traditional grocery stores because they lack fresh offerings, service, and offer a much smaller selection of lower quality items, usually about 8,000 SKUs in around 8,000 square feet of store space, focused on "nonperishable products, then a little bit of frozen, a little bit of dairy . . . a little bit of pet food, and . . . immediate-consumption type products." *Id.* at 176:9-11; 459:3-25 (Van Helden). Dollar stores do not provide a one-stop shopping experience because selection changes frequently and "you never know what

15

you are going to get" or if a particular item will be in stock. *Id.* at 461:15-18 (Unkelbach). Natural and gourmet stores have a "much smaller" assortment and store size, with one executive testifying that they have closer to 20,000 SKUs, and a greater focus on fresh, organic food and vitamins and differentiated brands that are "not as ubiquitous across the market." *Id.* at 367:22-368:25 (Neal). This includes a focus on organic, vegan, and gluten-free offerings and locally sourced produce. *Id.* at 369:12-370:15 (Neal). Sprouts Farmers Market, a natural and gourmet store, positions itself as a "secondary" or "fill-in" shop where customers might pick up a few additional items after getting ninety percent of their groceries on a primary shopping trip. *Id.* at 372:23-373:7 (Neal).

### d.    Distinct Pricing and Sensitivity to Price Changes

Supermarkets use a distinct pricing scheme and price check more frequently against other supermarkets. Supermarkets, including defendants, use a "high-low" or "promotional" pricing model. *See, e.g.*, *id.* at 306:21-307:4 (Groff). This model primarily consists of everyday, "white tag" or "base" prices with no discounts and lower "promotional" sale prices. *Id.* at 221:1-12 (Silva); 416:8-17 (Marx). Stores adjust these prices regularly in response to competition. According to industry participants, this model is distinct from other store formats discussed by the parties. Premium, natural and organic stores such as Whole Foods charge a higher price for their product offering based on the understanding that their target customers are willing to pay a premium for organic, fresh, and health-oriented offerings. *See, e.g.*, *id.* at 379:20-380:1 (Neal). Limited assortment stores such as Aldi and Lidl keep prices lower than supermarkets by offering primarily own brand or private label products, rather than national brands, limited to about 1,400 to 2,000 SKUs, and by having limited staffing and customer service. *Id*. at 940:10-25 (Knopf). Club stores like Costco leverage their size and limited selection to offer consistently lower prices on a smaller selection of SKUs. *Id.* at 2020:2-14 (George). And large retailers such as Walmart and Amazon use their significantly larger scale and scope to implement an "everyday low prices" approach in which certain products remain consistently at a low price, rather than cycling between white tag and promotional prices. *Id.* at 306:14-19 (Groff); 2347:21-2348:4 (Lieberman).

16

In locations where defendants overlap, where Kroger monitors pricing of "everyday essential" grocery items, Kroger most commonly price checks traditional supermarkets and supercenters, accounting for approximately seventy-nine percent of its price checks. PX7004 ¶ 91. Similarly, in Kroger's "rule based pricing" zones, where defendants overlap, the great majority of price checks are conducted against traditional supermarkets and supercenters. *Id*. ¶ 94, Fig. 17. In areas where defendants overlap, seventy-eight percent of Albertsons stores consider another supermarket their "primary food competitor." PX7004 ¶ 86; *see* Tr. 230:9-16, 231:5-7, 231:24-10 (Silva). Other supermarkets price check within the submarket as well. Stater Brothers, a "traditional supermarket," price checks primarily against Albertsons, Vons, and Ralphs; price checks only a small number of items against Costco because very few products provide a one-to-one match; and does not price check against limited assortment stores or dollar stores. Tr. 177:21-180:24 (Van Helden).

### iii. *Defendant's Counterarguments*

Defendants argue that the supermarket market is underinclusive. The grocery industry has changed, and larger retailers such as Amazon and Walmart, club stores such as Costco, and limited assortment stores such as Aldi and Lidl now compete with traditional grocers like Kroger and Albertsons. The various categories described by plaintiffs are outdated and only serve to "artificially segregate defendants from their competitive rivals." Defs. Resp. 5.

Defendants frequently referred to the concepts of "share of wallet" and "cross-shopping." The idea is that customers no longer, if ever, engage solely in one-stop shopping. Instead, customers cross-shop, making different purchases depending on their needs and goal on that particular day. Defendants presented evidence that customers cross-shop across a broad variety of store formats and that many stores consider a broad selection of others stores to be competitors. *See, e.g.*, Tr. 1694:12-13 (Sankaran) ("Nobody shops channels anymore."); 2292:5-11 (Gafsi Oblisk) ("We know at Whole Foods our customers tend to shop four to seven different grocery retailers in any given month."); PX1727 (internal document stating that Kroger considers its Ralphs banner to compete with Amazon Fresh, Trader Joe's, Whole Foods, Vallarta, Aldi, and Grocery Outlet). This included evidence that some retailers price check against a broad variety

of other store formats. *See, e.g.*, DX0270; Tr. 234423:2345:6 (Lieberman) (stating that Walmart tracks share of wallet); DX1340.

Similarly, the share of wallet concept is based on the premise that for a given budget, a customer may choose to spread their purchases across a number of retailers. Tr. 2185:21-23 (Yates). Those retailers, then, are competing for their share of each dollar spent. Defendants argue that modern customers allocate a portion of each dollar spent across a variety of grocery retailers, including club stores, natural and gourmet stores, limited assortment stores, dollar stores, ethnic grocers, and massive e-commerce retailers, demonstrating that they are all reasonably interchangeable substitutes in the same market. Defs. Resp. 18-19.

The defendants in *Whole Foods Market* also raised the argument that grocery shoppers cross-shop between PNOS and other stores and that PNOS shoppers check prices against conventional supermarkets. In that case, the court found no reason to discredit the PNOS submarket on the basis of cross-shopping, noting that "[of] course" cross-shopping occurs, as no store carries comprehensive inventory, and "[t]he fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market." *Whole Foods Mkt.*, 548 F.3d at 1040. Courts looking at other markets have consistently found that "cross-shopping is not necessarily indicative of reasonable interchangeability." *FTC v. Tapestry, Inc.*, No. 1:24-CV-03109 (JLR), 2024 WL 4647809, at *36 (S.D.N.Y. Nov. 1, 2024). It is not surprising that consumers spend money at a variety of different types of retailers, but this does not necessarily show that those retailers are reasonably interchangeable substitutes for a consumer's particular needs. The fact that a shopper may make a monthly trip to Costco to stock up on a smaller number of bulk purchases, for example, does not make a "Costco run" a reasonable substitute for a weekly one-stop visit to a supermarket to purchase most or all grocery items for the week.

Walmart loomed large over the preliminary injunction hearing. Defendants argued that Walmart captures a large portion of grocery purchases and that Kroger and Albertsons compete with Walmart's significantly lower prices. Kroger's chair and chief executive officer testified that "our number one competitor [is] Walmart; Costco would be number two; and Amazon, obviously, is an increasing

competitor."  Tr. 1574:13-15 (McMullen).  One Kroger executive said that Kroger is "monomaniacally" focused on Walmart and for twenty years "has put in place an agenda of getting to Walmart pricing."  *Id.* at 1819:24-1820:4 (Aitken).  Albertsons' chief executive officer testified that "the real challenge for the Albertsons companies is the Walmarts, the Amazons, the Costcos, the Aldis of the future."  *Id.* at 1696:22-24 (Sankaran).  Defendants argue that the fierce competition between defendants and Walmart (and other large retailers) shows that the supermarkets market is underinclusive.

The massive reach of Walmart and other large retailers does not, however, change the Court's conclusion that plaintiffs' proposed market is well-defined for antitrust purposes.  First, the supermarkets market accounts in part for Walmart because supercenters like Walmart and Target are captured in the market.  Second, despite defendants' contention that new actors have entered the grocery industry and capture a significant portion of sales, the *Brown Shoe* indicia show that there are still relevant submarkets within this larger market, including supermarkets.  Defendants argue that the *Brown Shoe* indicia are an "aid," not a "substitute" for economic analysis of reasonable interchangeability, and plaintiffs rely exclusively and improperly on the indicia without conducting the proper analysis.  Defs. Resp. 20.  It is not improper to rely on the indicia, however, as "there is no requirement to use any specific methodology in defining the relevant market."  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021).  And plaintiffs do not rely solely on the *Brown Shoe* indicia.  Having drawn the contours of the supermarket submarket using the indicia, plaintiffs then tested their definition with the standard economic analyses conducted in antitrust cases, which is discussed in subsection A.1.c.  Their analysis confirmed that the submarket was defined to include all reasonable substitutes.

Looking at the *Brown Shoe* indicia themselves, defendants argue that the supermarket market is not a valid submarket because the industry and public do not recognize "supermarkets" as a distinct category of retailer.  Defs. Resp. 21-22.  Some evidence before the Court shows that retailers that fall outside of the supermarkets submarket, such as Walmart, Whole Foods, Costco, and Amazon, consider a variety of retail categories, including supermarkets, limited assortment stores, dollar stores, e-commerce retailers, and natural and gourmet stores, to be competitors.  *See, e.g.*, Tr. 2012:8-20.  A relevant market,

however, need not include every possible competitor, only reasonable substitutes. And it is well established that a submarket, demarcating a smaller subset of a larger market, may be used as the relevant product market for antitrust analysis. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (quoting *Brown Shoe*, 370 U.S. at 325).

The fact that a different market could be drawn does not change the conclusion that the supermarket submarket is an appropriate and relevant market for this case. "'Whatever the market urged by the [FTC], the other party can usually contend plausibly that something relevant was left out, that too much was included, or that dividing lines between inclusion and exclusion were arbitrary.'" *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (quoting 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 530d (4th ed. 2014)). The Clayton Act is intended, however, to prohibit anticompetitive mergers "in any line of commerce or in any activity affecting commerce." 15 U.S.C. § 18. There is no carveout permitting mergers that would substantially lessen competition in one well-defined market but not another proposed market. *See United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022) ("Thus, even if alternative submarkets exist at other advance levels, or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable.").

### iv.    Conclusion

Supermarkets are distinct from other grocery retailers. Supermarkets offer a larger selection of fresh and non-perishable items, a one-stop shopping experience that appeals to a particular consumer's preference to meet all their grocery needs in one location, and a customer service focus with deli, bakery, meat, and other specialized departments. The evidence that industry professionals understand supermarkets to be a distinct category of stores that compete with each other, and that supermarkets monitor each other's pricing and are sensitive to changes bolsters the conclusion that supermarkets are a submarket within grocery retailers. For the reasons discussed above, the *Brown Shoe* indicia support plaintiffs' position that the supermarkets market, consisting of traditional supermarkets and supercenters, is a relevant product market for antitrust purposes.

### v.    The "Large Format Stores" Market

In an attempt to address defendants' argument that the supermarkets market is underinclusive, plaintiffs propose a second product market of "large format stores" consisting of traditional supermarkets and supercenters, natural and gourmet food stores, club stores, and limited assortment stores. Pls. Mot. 32; PX7004 ¶ 67.

Defendants argue that the inclusion of a second, broader market shows that plaintiffs cannot articulate a clear market definition.  Defs. Resp. 24.  However, plaintiffs are not required to determine the exact product or geographic market at the preliminary injunction stage, as they need only raise substantial doubts about the transaction.  *See Whole Foods Mkt.*, 548 F.3d at 1036 ("Section [13(b)] preliminary injunctions are meant to be readily available to preserve the status quo while the FTC develops its ultimate case, and it is quite conceivable that the FTC might need to seek such relief before it has settled on the scope of the product or geographic markets implicated by a merger.  For example, the FTC may have alternate theories of the merger's anticompetitive harm, depending on inconsistent market definitions.").

Plaintiffs, having defined the constituent markets that collectively form the large format stores market, spend comparatively less effort explaining why the large format store market is properly defined for antitrust purposes.  Large format stores serve as a conservative backstop, defined in order to demonstrate that the proposed merger would substantially lessen competition even in a comparatively broader market that includes many of the stores that defendants label as direct competitors.

The parties seem to largely agree that the types of stores included in the broader market, which all sell primarily food and grocery products but do not all cater to the one-stop shopper or have all of the distinct characteristics of a traditional supermarket, can be competitors and sell goods that may be reasonable substitutes for each other in some instances.  As discussed above, the Court heard testimony that retailers included in the large format stores market monitor each other's prices.  In their opposition to the supermarkets submarket, defendants advocated for defining a market like the large format stores market that includes club, natural and gourmet, and limited assortment stores, although defendants maintain that

21

large e-commerce retailers should still be included.  Defs. Proposed Findings of Fact & Conc.ls of L. ("Defs. Proposed FOF & COL"), ECF [480], ¶ 169.  E-commerce retailers like Amazon.com, however, have a substantially different business model than other large format stores, offering a massive number of SKUs, largely in non-grocery items, for shipping or delivery only, without physical stores.

The large format stores market includes reasonably interchangeable food and grocery items between competitor stores.  Shared characteristics and price tracking support the finding that the large format stores market is a relevant antitrust market.  And, as discussed below, economic analysis confirms that the market is appropriately defined.

b.      Geographic Market

"The relevant geographic market is the 'area of effective competition where buyers can turn for alternate sources of supply.'"  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991)).  It is "not where the parties to the merger do business or even where they compete," but rather "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate."  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963).

"The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market."  *Brown Shoe*, 370 U.S. at 336.  Because the definition of the relevant geographic market is a "pragmatic, factual" determination, "the geographic market in some instances may encompass the entire Nation, [and] under other circumstances it may be as small as a single metropolitan area.*"  Id*. at 336-37.  Although geographic markets can vary significantly in size, "[r]etail markets . . . are often small, especially when customers are motivated by convenience."  *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016).  Here, both sides agree that the distance a customer is willing to travel to a store is a significant factor in defining the relevant geographic market.

Plaintiffs argue that the relevant geographic market for both product markets is a local area drawn around each of defendants' stores.  Pls. Mot. 28.  Plaintiffs' expert Dr. Nicholas Hill, who has a Ph.D. in economics and extensive experience in antitrust matters, explained his methodology for determining the

scope of the local area. PX7004 ¶¶ 1-4. Dr. Hill created geographic markets by defining a candidate market around each of defendants' stores. For each geographic market he designated a "focal store," then calculated a seventy-five percent "catchment area," representing the area around it that includes seventy-five percent of its sales. *Id.* ¶¶ 101-102. Dr. Hill then doubled the radius of the catchment area and included all stores within the total area in the geographic market, reasoning that any store in that area is within the same radius from the catchment area itself and therefore at least as close to some customers as the focal store. *Id.* ¶ 103. For example, if seventy-five percent of a focal store's sales come from within a five-mile radius, the geographic area would include any stores in the product market within ten miles of the focal store. The sales and customer location data used to create the catchment areas was taken from defendants' own loyalty card data. *Id.* ¶ 106. That data showed that on average, more than seventy percent of defendants' sales are drawn from within five miles of a store, although the variation in customer distance is more evenly distributed across single-mile radius bands. *Id.* ¶¶ 107-108. This supports the drawing of small, local geographic markets that account for variation between stores. *See Sysco Corp.*, 113 F. Supp. 3d at 50 (adopting a local geographic market based on doubling a radius that captured seventy-five percent of sales at a particular distribution center).

        c.     Economic Evidence

           *i.*     *The Hypothetical Monopolist Test*

The primary test used by economists to determine whether a market is well-defined is the hypothetical monopolist test ("HMT"). *See, e.g., Saint Alphonsus*, 778 F.3d at 784; *Staples II*, 190 F. Supp. 3d at 121. The test asks whether a hypothetical monopolist in the proposed market could profitably raise prices. *Advoc. Health Care Network*, 841 F.3d at 468 (citing *Phila. Nat'l Bank*, 347 U.S. at 358). Specifically, the test measures whether a profit-maximizing hypothetical monopolist would be likely to undertake at least a small but significant non-transitory increase in price ("SSNIP") for at least one product. 2023 Merger Guidelines § 4.3.A. The Merger Guidelines consider a SSNIP of five percent to be significant. *Id.* § 4.3.B. If the hypothetical monopolist could impose a SSNIP the market is appropriately bounded to include reasonable substitute products and is therefore well-defined for antitrust purposes. If the

hypothetical monopolist could not profitably impose a SSNIP, it implies that customers can divert to a reasonable substitute outside of the proposed market that has been improperly excluded and the market is too narrowly defined for antitrust purposes.

As part of his analysis, Dr. Hill calculated the aggregate diversion ratio, which measures the percentage of customers who would switch to a store not included in the product and geographic market in response to a SSNIP at a focal store. *Id.* ¶¶ 117-18. An aggregate diversion ratio of zero indicates that no customer would switch to a store outside of the market, while a higher aggregate diversion ratio indicates the percentage of sales that are diverted outside of the market. This number is then compared to the critical diversion ratio, which represents the maximum percentage of sales that could be diverted to stores outside the proposed market for which a hypothetical monopolist would still be incentivized to impose a SSNIP. *Id.* ¶ 123. In the final step of the analysis, Dr. Hill compared the actual aggregate diversion ratio and critical diversion ratio. "If the actual aggregate diversion ratio is less than the critical aggregate diversion ratio, too few customers would switch to stores outside the proposed market to prevent a SSNIPT[1] by the hypothetical monopolist, and the proposed market is properly defined"; on the other hand, "if the actual aggregate diversion ratio is larger than the critical aggregate diversion ratio, then the opposite is true, and the proposed market is not a properly defined antitrust market." *Id.* ¶ 125.

Dr. Hill conducted the HMT on 2,537 proposed markets, representing 2,537 Kroger and Albertsons stores in overlap areas that have at least one of the other party's stores in its geographic area. *Id.* ¶ 139. Of those markets, 2,062 supermarkets markets and 2,503 large format stores markets pass the HMT. *Id.* ¶ 141. This result indicates that the great majority of plaintiffs' proposed markets are properly defined.

### ii.    *Defendants' Counterarguments*

Defendants argue that because there are additional substitutes and competitors beyond those included in plaintiffs' submarket, plaintiffs' submarket is not properly defined. Defs. Resp. 21.

---

[1] Dr. Hill uses the acronym "SSNIPT" ("small but significant non-transitory increase in price or worsening of terms"), which is synonymous with SSNIP. Because courts that write on this subject generally use "SSNIP," this opinion and order does as well.

Defendants presented expert testimony from Dr. Israel, who, much like Dr. Hill, holds a Ph.D in economics and has extensive experience in antitrust matters. DX2623 ¶¶ 1-6. Dr. Israel determined that Dr. Hill's economic analyses were invalid for a number of reasons. As to the product market definition, Dr. Israel opined that the supermarkets market is under-inclusive, omitting competitors, while the large format stores market is over-inclusive, inappropriately capturing distant competitors. *Id.* ¶¶ 22, 24. As to the geographic market, defendants argue that Dr. Hill's "circle-drawing approach" to defining geographic markets "does not align with the 'commercial realities' of how customers shop." Defs. Resp. 23 (citation omitted). In order to account for variation in different geographies, demographics, and customers' willingness to travel different distances for different stores, defendants proposed an alternative analysis that rejects standard market definition to focus exclusively on "strength of substitution." DX2623 ¶ 36.

Dr. Israel did not define an alternative product or geographic market for this case. He believes that because of the unique attributes of grocery retailers, "market definition and associated structural presumptions are simply not probative about competitive effects in this industry." *Id.* ¶ 191. Instead, Dr. Israel implemented an econometric model, referred to as the "EGK" model[2], or a "customer-based" approach, to measure substitution between stores. *Id.* ¶ 38. For each individual store, the EGK model "takes into account many different variables – including the store's format, the location of the store, and the demographics of a given area . . . [it] combines the product market and geographic market analyses without having to define markets ex-ante." Defs. Proposed FOF & COL ¶ 157. Because Dr. Israel does not define a product or geographic market, the EGK model captures diversion ratios to a range of stores that are not included in plaintiffs' proposed product markets. For example, Dr. Israel found that club stores, which are not included in the supermarket market, have the highest diversion ration from defendants' stores, including a 13.2% diversion ratio from Sam's Club and Costco. DX2623 at 57, tbl. 4. He argues that these results are more accurate and indicate that there is strong substitution between defendants and many store formats, most notably club stores, that are not captured in traditional economic models. *Id.* ¶ 105.

---

[2] "EGK" combines the names of the authors of the article from which Dr. Israel drew this model: Paul Ellickson, Paul Greico, and Oleksii Khavstunov, *Measuring competition in spatial retail*, 51 RAND J. of Econ. 189 (2020).

Dr. Israel eschewed the traditional HMT in favor of a test that the parties sometimes referred to as the "actual monopolist test." He describes this test as an implementation of "standard econometric techniques" and "a direct implementation of the hypothetical monopolist test that Dr. Hill describes, one that does not depend on economic modeling assumptions, but rather asks directly whether – all else equal – areas in which the putative markets approach monopoly levels experience a 'SSNIP.'" *Id.* ¶ 198. The test makes some intuitive sense: look at real-life examples of markets, including monopoly markets, to determine whether prices go up by a SSNIP as the markets move toward monopoly. Dr. Israel's application of the test found that "the relationship between prices and market concentration is too weak to find that a hypothetical monopolist would implement a SSNIP." *Id.* ¶ 199. Surprisingly, this included a finding that "even if Kroger were a hypothetical monopolist with a 100 percent share within Dr. Hill's supermarket or large format markets, it would not be expected to increase prices by even once percent." *Id.*

The Court was unable to find another example of the use of an "actual monopolist test" in a similar case. This is likely because the test, while helpful in understanding how existing markets differ now, does not attempt to predict the changes that would occur as a result of a change in the market. While the actual monopolist test accounts for real-world data, it doesn't control for other factors that may explain pricing in real-world monopolies, such as supply and demand, which differ across geographic markets.

Dr. Israel also asserts that, assuming that the HMT is a proper test, Dr. Hill uses incorrect inputs. Dr. Israel first reduced the number of focal stores that are tested by removing stores that would be divested to C&S, reducing the candidate markets from 2,537 to 1,640. *Id.* ¶ 134. He then ran the HMT using the diversion ratios estimated using his EGK model and variable, rather than gross, margins. With these changes, Dr. Israel found that only 141 of the 1,640 markets passes the HMT. *Id.* ¶ 137.

The Court is faced with two very different positions from two qualified experts. Ultimately, plaintiffs' economic analysis is more persuasive. Plaintiffs provide a market definition that survives qualitative and quantitative scrutiny using established antitrust economic methods. Defendants criticize the limitations of those methods but do not offer a meaningful alternative. Although defendants' proposed method for drawing customer-based diversion measures for each store may be more inclusive of

all potential competitors, "[a] geographic market does not need to include all of the firm's competitors; it needs to include the competitors that would 'substantially constrain [the firm's] price-increasing ability.'" *Advoc. Health Care Network*, 841 F.3d at 469 (citing *AD/SAT v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999)). Adopting Dr. Israel's proposal, which varies by store rather than defining a single product and geographic market, is difficult to square with traditional antitrust analysis.

\* \* \*

Based on the evidence presented, the Court finds that the "supermarkets" and "large format stores" markets, using the local geographic market delineated by Dr. Hill's focal store approach, are the relevant markets.

2. *Competitive Effects*

a. Market Concentration

Having defined the relevant market, courts next consider whether the proposed merger or acquisition would lead to anticompetitive effects in that market. *See Saint Alphonsus*, 778 F.3d at 785-86. Demonstrating that a merger would result in "a significant increase in the concentration of firms in that market" establishes a presumption that the merger will substantially lessen competition. *Phila. Nat'l Bank*, 374 U.S. at 363; *Baker Hughes*, 908 F.2d at 982.

The generally accepted measure of market concentration, endorsed by the Merger Guidelines, is the Herfindahl-Hirschman Index ("HHI"). 2023 Merger Guidelines § 2.1. The HHI is calculated by adding together the sum of the squares of the market shares of each market participant. *Saint Alphonsus*, 778 F.3d at 786; *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017). The HHI of a market ranges from 0 to 10,000, with 0 indicating that a market is comprised of many small firms and 10,000 indicating that the market is a monopoly. Under the 2023 Merger Guidelines, a merger that creates or further consolidates a market with an HHI greater than 1,800 and involves an increase in HHI greater than 100 is presumed to substantially lessen competition. 2023 Merger Guidelines § 2.1. The 2023 Merger Guidelines also presume that a merger substantially lessens competition if the merged firm has a market share greater than thirty percent and the merger involves an increase in HHI greater than 100. *Id.*; *see Phila.*

*Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.").

Dr. Hill calculated the pre- and post-merger HHI for each geographic market for both supermarkets and large format stores. He did so by calculating the market share for each store within a geographic market for both the supermarket and large format store markets. PX7004 ¶ 147. For large format markets, Dr. Hill found the post-merger concentration was presumptively unlawful in 1,785 markets under the 2023 Merger Guidelines and in 911 markets under the 2010 Merger Guidelines. PX7006 ¶ 35, fig. 10. In the supermarket market, Dr. Hill determined that 1,922 supermarket markets would have presumptively anticompetitive market concentration under the 2023 Merger Guidelines and 1,574 supermarket markets would be presumptively anticompetitive under the 2010 Merger Guidelines. PX7004 ¶ 351; PX7006 at E-12, fig. 43.

Dr. Israel found that a significantly smaller number of markets were presumptively unlawful. The difference in opinions on post-merger market concentration is due in part to Dr. Israel's decision to exclusively apply the 2010 Merger Guidelines (although Dr. Israel does in some instances additionally apply the 2023 Merger Guideline structural presumptions for sake of comparison with Dr. Hill's calculations). The 2010 Merger Guidelines, which were replaced by the 2023 Merger Guidelines, raised the thresholds for market HHI and change in HHI that would create a structural presumption. Under the 2010 Merger Guidelines, a merger that creates a market with an HHI greater than 2,500 and involves an increase in HHI greater than 200 was presumed to substantially lessen competition. 2010 Merger Guidelines § 2.1. The 2023 Merger Guidelines returned to the lower thresholds of the 1992 Merger Guidelines. Dr. Israel explains that he uses the 2010 presumption thresholds because those in the 2023 Merger Guidelines are "unreasonably low" and because the 2023 Merger Guidelines have not yet been adopted by any court. DX2623 ¶ 26.

"Although the Merger Guidelines are 'not binding on the courts,' . . . they 'are often used as persuasive authority.'" *Saint Alphonsus*, 778 F.3d at 784 n.9 (quoting *Olin Corp. v. FTC*, 986 F.2d 1295, 1300 (9th Cir. 1993); *Chicago Bridge & Iron Co. N.V. v. F.T.C.*, 534 F.3d 410, 431 n.11 (5th Cir. 2008)).

In the short time in which the 2023 Merger Guidelines have been in effect, multiple courts have cited them as persuasive authority without weighing their relative merits vis-à-vis the 2010 Merger Guidelines. *See, e.g., Tapestry, Inc.*, 2024 WL 4647809 at *7; *FTC v. Cmty. Health Sys., Inc.*, No. 5:24-CV-00028-KDB-SCR, 2024 WL 2854690, at *22-23 (W.D.N.C. June 5, 2024) (applying the 2023 HHI presumption thresholds), *op. vacated, appeal dismissed sub nom. FTC v. Novant Health, Inc.*, No. 24-1526, 2024 WL 3561941 (4th Cir. July 24, 2024); *Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-CV-04312-BLF, 2024 WL 1909156, at *3 (N.D. Cal. May 1, 2024).

As the 2023 Merger Guidelines explain:

> "The first merger guidelines to reference an HHI threshold were the merger guidelines issued in 1982. These guidelines referred to mergers with HHI above 1,000 as concentrated markets, with HHI between 1,000 and 1,800 as 'moderately concentrated' and above 1,800 as 'highly concentrated,' while they referred to an increase in HHI of 100 as a 'significant increase.' Each subsequent iteration until 2010 maintained those thresholds.
> . . . . During this time, courts routinely cited to the guidelines and these HHI thresholds in decisions. . . .
> Although the Agencies raised the thresholds for the 2010 guidelines, based on experience and evidence developed since, the Agencies consider the original HHI thresholds to better reflect both the law and the risks of competitive harm suggested by market structure and have therefore returned to those thresholds."

2023 Merger Guidelines § 2.1 n.15. This explanation is convincing and, encouraged by the fact that other courts have found the presumptions to be useful, persuasive authority when considering market concentration, the Court sees no reason to reject the 2023 Merger Guidelines in favor of a previous edition. Regardless, Dr. Hill's analysis shows that there are numerous presumptively unlawful markets under either the 2010 or 2023 thresholds, suggesting that the proposed merger is likely to substantially lessen competition under either set of guidelines.

Dr. Israel also had a significantly different result in his own market concentration analysis because he used different inputs. He included the proposed divestiture in his analysis, which reduced the number of possible markets to 1,640, and applied his market concentration analysis to the much smaller pool of markets defined using his EGK model and that passed his application of the HMT. DX2623 ¶¶ 138-39. Using his analysis, rather than looking at plaintiffs' proposed HMT-passing markets, Dr. Israel found that only sixty-five markets were presumptively unlawful under the 2010 Merger Guidelines and only 120

markets were presumptively unlawful under the 2023 Merger Guidelines. *Id.* at 78, tbl. 6. Dr. Israel also applied his analysis to plaintiffs' large format stores market and found that only twenty-two were presumptively unlawful under the 2010 Merger Guidelines and that only 231 were presumptively unlawful under the 2023 Merger Guidelines. *Id.* at 116, tbl. 10.

As with market definition, it is difficult to compare expert analyses that rest on such different assumptions and use different methodologies. Dr. Israel's analysis does not squarely address the matters necessary to determine whether post-merger market concentration will substantially lessen competition because he rejects the relevant antitrust markets that have been adopted in this case. He also prematurely accounts for the divestiture. At the rebuttal stage, defendants introduce evidence to show that the divestiture will mitigate anticompetitive harms. To establish a *prima facie* case, however, plaintiffs must show at this stage that the proposed merger itself is likely to substantially lessen competition. The Court is more inclined to credit Dr. Hill's analysis, which uses inputs and assumptions that align with the relevant markets adopted in this case and which do not reach the divestiture until the rebuttal stage. The Court is also persuaded by Dr. Hill's use of longstanding antitrust economic analysis tools, which Dr. Israel rejects because he views traditional market share analysis as irrelevant to this particular industry.

Based on the evidence presented, the Court finds that the merger would lead to undue market concentration in multiple geographic markets in both the supermarkets and large format stores markets that would presumptively lessen competition. A finding of harm in any one significant market would be sufficient for plaintiffs to establish their prima facie case. *See RSR Corp. v. FTC*, 602 F.2d 1317, 1321 (9th Cir. 1979) ("[T]he effects of a merger must be examined in each economically-significant submarket to determine if there is a reasonable possibility that the merger will substantially lessen competition in that submarket. If the merger could do so, it violates Section 7."). By showing that the proposed merger would presumptively lessen competition in multiple markets, plaintiffs have met their *prima facie* burden.

b.    Elimination of Significant Competition

The government can also demonstrate that a merger may substantially lessen competition

by showing that the merging parties engaged in substantial competition prior to the merger. *See United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665, 669-70 (1964) ("We think it clear that the elimination of significant competition between [the merging parties] constitutes an unreasonable restraint of trade in violation of § 1 of the Sherman Act."). Courts recognize that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition. *Sysco Corp.*, 113 F. Supp. at 61. When such a merger occurs, it "is likely to have unilateral anticompetitive effect if the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011). "[T]his is true even where the merging parties are not the only two, or even the two largest, competitors in the market." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 216 (D.D.C.), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). When determining whether there is substantial head-to-head competition, "[c]ourts frequently rely on ordinary course documents and witness testimony illustrating that two merging parties view each other as strong competitors." *IQVIA Holdings Inc.*, 710 F. Supp. 3d at 383.

Before reaching the substance of the claim, defendants argue that plaintiffs' theory of loss of head-to-head competition is "legally deficient" because the fact that a merger eliminates head-to-head competition between the merging firms is not sufficient to make out a *prima facie* case absent evidence of undue market concentration. Defs. Resp. 32-33 (citing *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 310 (D.D.C. 2020) ("The Court is unaware of a single case in which a court has enjoined a merger, even at this preliminary stage, where the Government failed to show undue concentration in a relevant market as its prima facie case requires, almost always through an HHI or similar metric.")). This argument is beside the point because plaintiffs have already met their *prima facie* burden based on the post-merger changes in market concentration. A showing of elimination of head-to-head competition bolsters their case with additional evidence of loss of substantial competition between defendants.

### i.    Ordinary Course Documents and Witness Testimony

Plaintiffs argue that defendants "compet[e] fiercely on convenience, price, quality, service, selection, shopping experience, and location." Pls. Mot. 9. Testimony about defendant's data analytics and

pricing strategy shows that defendants monitor and respond to each other's pricing. Albertsons operates a national pricing team that directs its divisions on how to price products. Tr. 220:22-25 (Silva). It is organized into fourteen divisions, either by region (e.g., the Portland Division) or by banner (e.g., the Shaw's Division). PX6153 at 002; Tr. 220:11-21 (Silva). In all but one division, Albertsons uses a "price advisor" tool to set pricing. Tr. 221:16-23 (Silva). This tool takes as input price checks from competitors, then recommends prices and alerts when a price rises above a competitor. *Id*. at 222:12-8 (Silva). Albertsons typically runs a weekly full book price check against Kroger and other competitors to use its price advisor. *Id*. at 223:14-23 (Silva). In each division, Albertsons price checks against a "primary food competitor." *Id*. at 227:7-228:9 (Silva). For example, every Albertsons store in the Portland Division considers Fred Meyer, a Kroger banner, its primary food competitor, all but one price area in the Denver Division considers a Kroger banner its primary food competitor, and all Albertsons stores in the Southwest, Seattle, and InterMountain Divisions consider a Kroger banner its primary competitor. PX12359. In markets where a Walmart is available, Albertsons also price checks Walmart. Tr. 256:10-13 (Silva). Albertsons uses this data to create a "competitive pricing index" ("CPI"). The CPI is an index between Albertsons, the primary food competitor, and Walmart. *Id*. at 1752:16-21 (Sankaran). The price advisor issues an alert when the price of an Albertsons SKU strays too far from the primary food competitor. *Id*. at 236:6-11 (Silva). In addition to the price advisor tool, Albertsons monitors price competition using in-person store visits, ad circulars, and other data. *See, e.g.*, *id*. at 537:15-25 (Huntington).

Kroger uses multiple pricing models. The parties frequently referenced the "everyday essentials" program, which sets pricing on bananas, eggs, iceberg lettuce, milk, and sugar, considered important and competitive grocery items. *Id*. at 484:15-17 (Kammeyer). Kroger organizes its stores into small pricing zones, usually consisting of one to five stores, and price checks everyday essentials items against competitor stores to determine its own prices. PX7004 ¶ 89; Tr. 270:4-17 (Groff). In areas where defendants overlap, Kroger most frequently price-checked against Walmart, ███████████████████ ███████████████████████, and price-checked against Albertsons banners ███████████████ ███████. PX7004 ¶ 171. Kroger also implements a "rules-based pricing" system that delineates

geographic areas and creates rules for pricing decisions within each zone. Similar to Albertsons, Kroger designates a "traditional competitor" as a price guideline and Walmart as a "primary benchmark." Tr. 273:23-274:4 (Groff); *see, e.g., id.* at 81813-819:14 (Schwilke); PX1497. For its rules-based pricing zones, Kroger most frequently checks against Walmart and Albertsons banners. PX7004 ¶ 172. One pricing rule is the "high-price retailer" ("HPR") rule, which requires that Kroger not set prices higher than "traditional competitors." Tr. 276:5-16 (Groff). Kroger designates an HPR in each division, and it is frequently an Albertsons banner. *Id.* at 280:12-282:11 (Groff); PX1109.

Some divisions of Kroger benchmark prices directly against Albertsons store prices rather than participating in the rules-based pricing schemes. Mariano's, for example, generally sets prices against Jewel-Osco, while QFC sets prices against Safeway. Tr. 285:13-286:10 (Groff). In order to monitor promotional pricing, Mariano's send employees to check Jewel-Osco stores in person and monitors ad circulars. *Id.* at 422:21-424:2 (Marx). For regular, white-tag pricing, Mariano's receives weekly reports on essential products like eggs, checking the price against Jewel-Osco and other competitors. *See, e.g.*, PX1824 ("Weekly review on egg cost and retails. . . . ██████████████████████████████ ██████████████████████████ . . . Jewel and Meijer's held their retails this week and Walmart moved down . . . we will stay the same."); PX1805; PX1823. Even divisions that use rules-based pricing tools monitor price competition with in-person store visits, ad circulars, and other data. *See, e.g.*, Tr. 483:6-484:10 (Kammeyer) (Fred Meyer division president testifying that he visits Albertson stores and receives pricing spreads against Albertsons banners "once or twice a month"); PX1743; PX1726.

Plaintiffs also presented evidence showing that defendants compete in other aspects of grocery retailing, such as product quality, freshness, assortment, customer service, and convenience. *See, e.g.*, Tr. 1649:8-1650:3 (McMullen) (testifying that Kroger and Albertsons compete to offer fresh produce, friendly customer service, and different rewards and loyalty programs); 813:17-814:6 (Schwilke) (President of Ralphs, a Kroger banner, testifying that he visits Albertsons stores to look at how "full, fresh, clean, and friendly" they are); PX2585 at 001 (internal Albertsons email stating its Southern California stores are known for "[c]lean merchandised stores when compared to primary competitor Ralphs.").

33

The effect of a new entry into market can be indicative of how closely two competitors compete. Plaintiffs demonstrated that the opening of a new party store near an existing party store is likely to draw sales away from the existing store, indicating that defendants compete closely. Albertsons' data on nearby store openings indicates that when a Kroger banner opens nearby, Albertsons stores lose on average over seven percent of sales, which is significantly large than the percentage of sales lost to supercenters, club stores, limited assortment stores, and other retailers. PX7004 ¶ 176. When workers at King Soopers stores in Colorado went on strike for nine days in January 2022, sales at affected King Soopers stores fell by nineteen percent, while sales at nearby Safeway stores increased by twenty-one percent. *Id.* ¶ 178. Approximately thirty-one percent of the lost King Soopers sales were diverted to Safeway stores. *Id.*

ii. *Defendants' Arguments*

Here, as when addressing market definition, defendants emphasize that the true competition is Walmart, followed by other mass retailers. The fact that defendants may monitor Walmart's prices, consider it a competitor, and attempt to compete with its prices does not mean, however, that defendants do not substantially compete with each other. On the contrary, the ordinary course documents before the Court show that Kroger and Albertsons view each other as strong, even primary, competitors. *See, e.g.*, PX1420 at 001 ("Not sure how they think [Fred Meyer is] not in direct competition with [Albertsons/Safeway]. They are our biggest competitors with 300+ stores."); PX2791 (listing primarily Kroger banners in Albertsons' historical price competitor data from 2019 to 2022); PX12476 at 003 ("Customers now see pricing for [Albertsons] key priority items that lines up nicely with our top food competitor, Fred Meyer.").

To the extent that defendants do monitor Walmart, it is frequently as a more ambitious target. *See, e.g.*, DX0588 (March 2023 internal Kroger communication regarding produce pricing strategy stating "we only index with Walmart at a ▮▮▮ and our true competition is Safeway. Up until now we have been allowed to go closer to Safeway pricing even though they have us listed as Walmart as our true competition."). Some testimony suggests that while defendants may aspire to compete on pricing with Walmart, they have not yet been able to do so consistently. For Albertsons, while the short-term goal is to

compete with primary food competitors, the long-term goal is "to chip away at the bigger target, which is Walmart, but it is very far away." Tr. 259:20-23 (Silva). One Albertsons executive testified that while their "attainable goals are really focused on our primary grocers," the long-term goal was to compete with the pricing of "our biggest competitor . . . the biggest competitor on selling groceries in the United States is Walmart . . so we need to get closer to our primary food competitors because we know it eventually chips away at the price position against Walmart." *Id.* at 248:16-25 (Silva). These ordinary course documents are indicative of the business realities on the ground. *See Staples I*, 970 F. Supp. at 1079 ("In document after document, the parties refer to, discuss, and make business decisions based upon the assumption that 'competition' refers to other office superstores only.").

Even accepting defendants' assertion that Walmart is their biggest competitor, a merger need not be solely between the two largest competitors to eliminate substantial head-to-head competition and result in anticompetitive effects. *See Anthem*, 236 F. Supp. 3d at 216 ("Anthem's insistence that United, not Cigna, is its 'closest' competitor, is beside the point. The acquired firm need not be the other's closest competitor to have an anticompetitive effect; the merging parties only need to be close competitors."); *H & R Block*, 833 F. Supp. 2d at 83 ("The fact that Intuit may be the closest competitor for both HRB and TaxACT also does not necessarily prevent a finding of unilateral effects for this merger. . . . Using a simple estimate of diversion based on market share would indeed suggest that HRB and TaxACT are each other's second closest rivals after Intuit.").

       *iii.*    *Economic Analysis*

Dr. Hill analyzed the likelihood that the removal of head-to-head competition would substantially lessen competition using an econometric method called "compensating marginal cost reduction" ("CMCR"). CMCR "calculates the amount by which a merger would have to reduce marginal cost to offset the loss of competition due to the merger." PX7004 ¶ 22. In other words, it measures a merged firm's incentive to raise its prices post-merger. It takes into account the diversion ratio, which captures the diversion between the parties' stores, and the margin earned by the stores, and is reported as a percentage of marginal cost. If the CMCR is greater than the expected reductions in marginal cost

anticipated to result from the merger, the merged firm is likely to increase prices due to the merger. *Id.* ¶¶ 188-89. Dr. Hill found that in 1,513 large format store markets the CMCR was greater than five percent, meaning that the merger is likely to result in a price increase for the focal store in each market unless the merger were to reduce marginal costs by more than five percent. *Id.* ¶ 193; PX7006 at 40, fig. 13. These numbers are indicative of the high level of competition between defendants and a high likelihood that the proposed merger would have unilateral anticompetitive effect.

        Dr. Israel opined that the CMCR analysis was of limited utility because Dr. Hill's diversion ratio did not accurately capture differentiation between store locations, formats, and characteristics. DX2623 ¶ 27. Instead of using the CMCR, Dr. Israel used a tool called the "gross upward pricing pressure index" ("GUPPI"). *Id.* ¶ 245. The GUPPI is a tool "commonly used in merger analysis to quantify the upward pricing pressure associated with the merger" which accounts for both the upward pricing pressure exerted by the merger and the downward pricing pressure exerted by the proposed divestiture. *Id.* ¶¶ 246-48. Much like with his previous calculations, Dr. Israel diverged from Dr. Hill by using his EGK substitution estimates rather than the adopted markets and accounted for the proposed divestiture. *Id.* ¶¶ 247-50. Dr. Israel found that only two stores exceeded a five percent GUPPI, meaning that for all other stores there will be no significant upward pricing pressure and defendants will have no incentive to raise prices at these stores. *Id.* ¶ 253.

        As with the previous economic analyses, defendants' results are of limited probative value because of Dr. Israel's differences of opinion regarding the appropriate market definition and his decision to include the divestiture at the *prima facie* stage. Plaintiff's analysis is persuasive and shows that the loss of head-to-head competition will incentivize price increases in many markets.

*iv.*    Conclusion

        On balance, the Court finds that both qualitative and quantitative evidence shows that defendants engage in substantial head-to-head competition and the proposed merger would remove that competition. As a result, the proposed merger is likely to lead to unilateral competitive effects and is presumptively unlawful.

36

3.      *Rebuttal Evidence*

Plaintiffs have met their burden of establishing a *prima facie* case that the proposed merger will substantially lessen competition. Defendants "may rebut that presumption by showing that the traditional economic theories of the competitive effects of market concentration are not an accurate indicator of the merger's probable effect on competition or that the procompetitive effects of the merger are likely to outweigh any potential anticompetitive effects." *Sysco Corp.*, 113 F. Supp. 3d at 72. Defendants advance three primary arguments on rebuttal: first, that other competitors will aggressively expand, constraining the merged firm's market power; second, that efficiencies generated from the merger will mitigate the proposed merger's anticompetitive effects; and third, that the proposed divestiture will mitigate the proposed merger's anticompetitive effects.

a.      Ease of Entry and Expansion

"Barriers to entry are important in evaluating whether market concentration statistics accurately reflect the pre- and likely postmerger competitive picture" because "[i]f entry barriers are low, the threat of outside entry can significantly alter the anticompetitive effects of the merger by deterring the remaining entities from colluding or exercising market power." *H.J. Heinz Co.*, 246 F.3d at 717 n.13. As a result, "[a]s part of its rebuttal case, a defendant may introduce evidence that entry by new competitors will ameliorate the feared anticompetitive effects of a merger." *Aetna Inc.*, 240 F. Supp. 3d at 52. Entry must be "timely, likely, and sufficient." *Id.* To show that entry is timely, likely, and sufficient, defendant must demonstrate that it is "sufficient 'to fill the competitive void that will result'" from the merger. *H & R Block*, 833 F. Supp. 2d at 73 (quoting *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 169 (D.D.C. 2000)).

Defendants argue that any anticompetitive effects will be mitigated, and plaintiffs' measures of market concentration are rendered of limited utility, by the ease of entry and expansion in the grocery industry. Defs. Resp. 39.

The Court heard conflicting and limited evidence on the ease of entry into the supermarket and large format stores markets. On the one hand, a number of competitors within the supermarket and

large format stores markets have expressed their intention to expand and open additional stores in the coming years. Amazon's 2017 acquisition of Whole Foods, for example, spurred growth and expansion of Whole Foods stores. Whole Foods opened approximately twenty stores in the past two years and has about seventy-five stores under development to open "in the coming few years." Tr. 2290:1-3; 2326:12-23 (Gafsi Oblisk). Costco generally intends to open about twenty to thirty stores a year, with half of those in the United States. *Id.* at 2025:13-21 (George). Walmart plans to open 150 stores over the next five years. *Id.* at 2338:16-20 (Lieberman).

On the other hand, industry participants emphasized that opening a grocery retailer entails a significant financial investment and years of planning, construction, and strategic deliberation. For one traditional supermarket, when starting with a new lot and building up a store, construction can take a minimum of four years and require an initial expenditure of about $20 million. Tr. 189:21-190:9 (Van Helden). When Albertsons opens a new store in Southern California, land negotiations can last two to four years, the physical process of opening the store can take eleven months, and the process can cost between $9 and $15 million. *Id.* at 874:1-19 (Curry). Planned entries into market have not always gone as intended. Amazon Fresh, for example, currently operates about fifty stores. *Id.* at 2296:10-13 (Gafsi Oblisk). In 2023, Amazon announced that it would pause construction of new Amazon Fresh stores to improve future offerings, ███████████████████████████. *Id.* at 2323:20-2324:2 (Gafsi Oblisk); ███████ ███████. Dr. Hill calculated that there is a relatively low entry rate for new stores in the large format stores market, with a net growth of less than three percent per year. PX7004 ¶ 196. In some markets, including Portland, more stores are exiting the market than entering it. *Id.*

Given the limited, conflicting, and somewhat speculative evidence available to the Court regarding the ease of entry and expansion in the relevant markets, defendants' assertion that many competitors have plans to expand their offerings and open more stores is not sufficient to show that entry of new competitors in either of the relevant markets will be timely, likely, and sufficient to mitigate the anticompetitive effects of the merger. This is especially true in the supermarkets market, which does not include Whole Foods, Costco, Amazon, or other retailers that defendants indicated have particularly

aggressive expansion plans.

           b.        Merger Efficiencies

The merger of two firms may lead to procompetitive efficiencies. The Supreme Court has never recognized efficiencies as a defense to a Section 7 claim and, on the contrary, has suggested that efficiencies cannot be a defense. *See Brown Shoe*, 370 U.S. at 345 ("Of course, some of the results of large integrated or chain operations are beneficial to consumers. Their expansion is not rendered unlawful by the mere fact that small independent stores may be adversely affected. It is competition, not competitors, which the Act protects. But we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned business. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision."); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967) ("Possible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition."). While several other circuits have recognized the defense, the Ninth Circuit "remain[s] skeptical about the efficiencies defense in general and about its scope in particular," although it has considered efficiencies rebuttals. *Saint Alphonsus*, 778 F.3d at 790.

Courts that have considered an efficiencies defense have found that to rebut evidence of high market concentration levels, a defendant must show "proof of extraordinary efficiencies." *H.J. Heinz Co.*, 246 F.3d at 720; *see* 2023 Merger Guidelines § 3.3 ("Cognizable efficiencies that would not prevent the creation of a monopoly cannot justify a merger that may tend to create a monopoly."). "The critical question raised by the efficiencies defense is whether the projected savings from the mergers are enough to overcome the evidence that tends to show that possibly greater benefits can be achieved by the public through existing, continued competition." *Cardinal Health, Inc.*, 12 F. Supp. 2d at 63.

Efficiencies must be merger-specific, meaning "they must be efficiencies that cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor." *H.J. Heinz Co.*, 246 F.3d at 722. Defendants bear the burden

of demonstrating that the efficiencies are merger-specific. *Sysco Corp.*, 113 F. Supp. 3d at 82. Defendants must also show that the efficiencies are verifiable. *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 73 (D.D.C. 2009). "[T]he court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *H.J. Heinz Co.*, 246 F.3d at 721. Finally, defendants must demonstrate that merger-specific and verifiable efficiencies will have a positive effect on competition. *Saint Alphonsus*, 778 F.3d at 792.

Defendants argue that the proposed merger will create cost-saving efficiencies that will be passed on to customers of the merged firm. Defs. Resp. 40-41. They created an "integration management office" to plan for the merger that, employing external consultants handling competitively sensitive data from both defendants in a "clean room," forecasted potential efficiencies to be generated by the merger. Tr. 2066:22-2067:7 (Maharoof). Based on those projections, Kroger estimated that these annual efficiencies would amount to ███████████████████████████ DX2736 ¶ 8; DX 1727 at 15. Kroger's vice president of strategic finance described the primary areas in which defendants anticipate cost savings and revenue enhancements resulting from, amongst other possibilities, reduced sourcing costs, increased supply chain efficiency, expanded private label offerings, increasing revenue at Albertsons' pharmacies, and increasing alternative profit, non-grocery revenue. DX2736 ¶ 23.

The majority of projected efficiencies related to sourcing, supply chain, manufacturing, and merchandising costs. *See* DX1727 at 15. In particular, defendants focused on lowering sourcing costs based on "price transparency." Because Kroger and Albertsons may pay different prices for the same vendors or products, the merged firm's shared knowledge of those prices will allow it to negotiate a "best-of-both" price toward the lower end of the range of prices. Tr. 2073:14-2074:5 (Maharoof). Defendants also highlighted opportunities to increase revenue from private label brands by offering higher-selling items from both Kroger and Albertsons private labels across stores; applying Kroger's more mature retail media capabilities to Albertsons stores; and improving manufacturing, distribution center, and transportation supply chains based on the increased density of stores. *Id.* at 2070:25-2071:16; 2071:20-2072:10; 2074:6-

12 (Maharoof).

Kroger conducted its own internal validation of the projected efficiencies. Consultants hired by defendants to assist with efficiencies projections created "fact packs" containing "higher level summaries of the methodologies" used to project efficiencies, which were then reviewed by Kroger analysts. *Id.* at 2080:23-2081:9 (Maharoof); 2115:12-18 (Gokhale). Kroger's integration management office had reviewed and "validated," or conducted analysis, documented, and created plans for, eighty-five to ninety percent of the estimated efficiencies at the time of the preliminary injunction hearing. *Id.* at 2078:20-2079:20 (Maharoof); DX2736 ¶ 35.

Rajiv Gokhale, defendants' expert witness in financial economics, was asked to opine on whether the projected efficiencies were both merger-specific and verifiable. *See* DX2736. He found that between ███████████████████████ in alleged efficiencies were merger-specific and verifiable under both the 2010 and 2023 Merger Guidelines, although he noted that his estimates were likely conservative because he was not able to verify some of the data by the date of his report. *Id*. ¶ 13. Mr. Gokhale reviewed the consultant fact packs and their underlying methodologies to come to these conclusions. He found the projected efficiencies data produced by Kroger and its consultants to be reliable because of the bottoms-up analyses, the experience and expertise of each consulting firm and the Kroger employees creating the estimates, and because Kroger executives have an incentive to achieve the identified efficiencies. Tr. 2115:7-2116:10 (Gokhale); DX2736 ¶¶ 59-64.

Mr. Gokhale considered each category analyzed by Kroger, assessed the consultant methodology for validating it, and explained why he found some or all of the projected efficiencies to be merger-specific and verifiable. For example, Mr. Gokhale found all of the projected efficiencies related to national brand sourcing to be merger-specific and verifiable based on his review of the methodology used to calculate them and his assessment that reductions in negotiated prices could not be achieved without the price transparency resulting from the merger. DX2736 ¶ 99. On the other hand, Mr. Gokhale found that projected efficiencies resulting from the adoption of Kroger's distribution facility operations practices across Albertsons facilities were not merger-specific because there was a possibility that they could be

achieved absent the merger. *Id.* ¶ 201.

Plaintiffs' finance and economics expert witness Aaron Yeater analyzed defendants' efficiencies claims. Mr. Yeater found that defendants had not demonstrated that all of efficiencies were verifiable or merger-specific and concluded that only ███████ of the cost efficiencies identified by Mr. Gokhale were cognizable. PX7000 ¶¶ 37-43; PX7011 ¶¶ 8-12.

Mr. Yeater found, and separate testimony supported, that certain efficiencies projections are unverifiable. For example, defendants expect to reduce national brand sourcing costs prices because their shared knowledge of vendor pricing will grant them increased negotiation power and knowledge. Lower costs resulting from price transparency are not guaranteed, however, because defendants must negotiate those prices with vendors and have not and cannot do so until after the merger is consummated. Tr. 2104:1-22 (Maharoof). An executive from the J.M. Smuckers Company ("Smuckers"), which sells national brand SKUs to both defendants, testified that they implement a standardized pricing scheme broken into three brackets based on the total weight of an order rather than negotiating prices with individual customers. *Id.* at 2565:20-2566:6 (Crane). In exchange for agreeing to promote Smuckers products in their store, Smuckers offers "trade funds" in varying amounts that can be applied to reduce the cost of their next order. *Id.* at 2568:3-15 (Crane). As Mr. Yeater explained, this is a common business model. Many national brands offer a non-negotiable base price, sometimes in a range of brackets based on order size, but offer discounts related to product placement within a store, use of end-shelf advertising, or participation in other promotional and marketing activities. A store may, for instance, receive a credit for agreeing to place certain national brand displays in a floor display, which would then be credited against the future cost of goods ordered. *Id.* at 3300:10-3301:3 (Yeater). Because sourcing cost variation is often due to individual store decisions about participating in these programs, rather than base pricing, it is difficult to attribute different national brand costs between defendants to negotiating strength rather than promotional decisions. PX7011 ¶¶ 40-42. Mr. Yeater opined that even assuming different base prices are offered to each defendant, negotiations with vendors are complex and uncertain, with factors other than price knowledge at play, making it difficult to quantify or assume that defendants will capture all possible price reductions. *Id.* ¶¶

42-44.

Assuming Mr. Gokhale's analysis contains no errors, only a portion of defendants' efficiencies are verifiable and merger-specific. This is a difficult assumption to make because there is some inherent unreliability to the data underlying his analysis. Kroger and its consultants were still in the process of creating and validating their own fact packs and projections at the time the experts prepared their reports and testified and Mr. Gokhale was not able to assess all of the projected efficiencies. And while Mr. Gokhale did not always agree with the consultants' conclusions regarding the projected efficiencies, he generally relied upon the cost calculations and methodological choices made by Kroger and the consultants, including methodological assumptions, without testing those assumptions. Mr. Yeater's report raises credible reasons to doubt some of the assumptions underlying the projection methodologies.

Using either Mr. Gokhale or Mr. Yeater's analysis, the cognizable efficiencies represent only ███████████████████████████████████████████. PX7011 ¶ 11. Defendants do not provide a particular number that they assert would be sufficient to offset the anticompetitive harms. Dr. Hill calculated that the merger is likely to result in a price increase for the focal store in 1,517 large format stores markets unless the merger were to reduce marginal costs by more than five percent. PX7004. ¶ 193. The high-end projected efficiencies cannot do that. Neither financial expert estimates "extraordinary" efficiencies. Even accepting Mr. Gokhale's high-end cognizable efficiencies estimate, it is doubtful that the efficiencies generated by the merger will lead to greater public benefit than maintaining existing levels of competition.

Based on their projected efficiencies, defendants tout their promise to make a $1 billion "price investment" should the merger go through. Tr. 1616:2-5 (McMullen). The price investment takes the form of price reductions on certain key grocery items in Albertsons stores over a period of four years. DX2237 at 2; Tr. 1616:18-23 (McMullen); 1836:21-1837:10 (Aitken). This price investment is particularly significant because defendants intend for it to help bring Albertsons' prices, which tend to be higher, into line with Kroger's pricing scheme. Tr. 1611:13-15 (McMullen). Defendants have also stated that they intend to spend $1.3 billion on improving acquired Albertsons stores and warehouses and another $1 billion

annually on improving employee wages, training, and benefits. *See, e.g.*, Tr. 1619:13-17; 1621:6-15 (McMullen). Defendants' executives testified during the hearing that it was their true intention to follow through with this promise, while acknowledging that there was no legal or contractual obligation binding them to do so. *See, e.g.*, Tr. 1618:8-19; 1626:3-12 (McMullen). Defendants pointed to evidence of follow-through with promised investments, albeit in smaller amounts, following Kroger's acquisition of Roundy's and Harris Teeter. DX2623 ¶ 19, 19 n.28.

Courts ordinarily must be skeptical of unenforceable promises, especially those made during an antitrust investigation, because "promise[s] can be broken at will." *Bertelsmann*, 646 F. Supp. 3d at 50; *see also FTC v. Meta Platforms Inc.*, 654 F. Supp. 892, 937 (N.D. Cal. 2023) ("[S]ubjective corporate testimony is generally deemed self-serving and entitled to low weight"). Despite defendants' best intentions to follow through on their promises at this moment, the business realities on the ground after the merger may change what defendants are able to invest or what is in their best interest to invest. "This is particularly salient given that the ability to make price investments rests, in part, on the generation of efficiencies. While the Court has no reason to doubt that defendants would honor their promise, this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case." *H & R Block, Inc.*, 833 F. Supp. 2d at 82.

A significant portion of the purported merger efficiencies are neither merger-specific nor verifiable. Without evidence of merger-specific, verifiable efficiencies, the benefits of which will be passed through to consumers, defendants cannot rebut the presumption of anticompetitive effects.

c.     Divestiture

"Defendants bear the burden of showing that any proposed remedy," including a divestiture, "would negate any anticompetitive effects of the merger." *Staples II*, 190 F. Supp. 3d at 137 n.15. A divestiture is successful rebuttal evidence if it "sufficiently mitigate[s] the merger's effect such that it [is] no longer likely to substantially lessen competition." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1059 (5th Cir. 2023). Phrased differently, the divestiture "must 'replac[e] the competitive intensity lost as a result of the merger." *Aetna Inc.*, 240 F. Supp. 3d at 60 (alteration in original) (quoting *Sysco Corp.*, 113 F. Supp.

3d at 72).  When considering whether a proposed divestiture will restore competition courts look at "several factors, including 'the likelihood of the divestiture; the experience of the divestiture buyer; the scope of the divestiture[;] the independence of the divestiture buyer from the merging seller[;] and the purchase price.'" *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 135 (D.D.C. 2022) (alterations in original) (quoting *RAG-Stiftung*, 436 F. Supp. 3d at 304), *appeal dismissed*, No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023).  The parties do not dispute that the divestiture will occur if the merger is consummated but do dispute other relevant factors.

Defendants argue that plaintiffs bear the burden of accounting for the divestiture in their *prima facie* case.  Defs. Resp. 25 (citing *United States v. Atl. Richfield Co.*, 297 F. Supp. 1061, 1067 (S.D.N.Y. 1969), *aff'd sub nom. Bartlett v. United States*, 401 U.S. 986 (1971) ("The complaint carefully avoids even a mention of this [divestiture] agreement though it was fully known to the Government when the complaint was drawn.")).  They assert that the holding in *UnitedHealth Group* supports their position.  In that case, the court considered the government's position that it need not account for a proposed divestiture in its *prima facie* case against the defendant's position that the burden of proof regarding a divestiture remedy must be carried by the government at the *prima facie* stage.  The court acknowledged that while it agreed with defendant's position, to adopt it would diverge from established case law. *UnitedHealth Grp. Inc.*, 630 F. Supp. 3d at 133.  Ultimately, the court applied the government's standard in its analysis, finding that "the evidence leads to the same result under either standard."  *Id.* at 134.  Two other cases cited by defendants, *Illumina, Inc.*, 88 F.4th 1036, and *Federal Trade Commission v. Microsoft Corp.*, 681 F. Supp. 3d 1069 (N.D. Cal. 2023), do not squarely address how divestitures should be considered in the burden-shifting framework.  Those cases cited *UnitedHealth Group* for its rejection of the argument that a defendant, in raising a divestiture defense in its rebuttal argument, must show that the merger will preserve exactly the same level of competition, rather than sufficiently mitigate the merger's anticompetitive effects such that it was no longer likely to substantially lessen competition.  *See Illumina, Inc.*, 88 F.4th at 1058-59; *Microsoft Corp.*, 681 F. Supp. 3d at 1090.

Defendants do not describe their divestiture arguments as a component of their rebuttal

because of their position that plaintiffs should have addressed the divestiture in the first instance. In line with the case law, however, the Court considers evidence regarding the divestiture along with the other rebuttal arguments.

     *i. Economic Evidence*

     Defendants argue that the divestiture will resolve any anticompetitive effects of the merger. Defs. Resp. 26. Plaintiffs argue that the piecemeal selection of stores and assets will hinder C&S' ability to timely and effectively compete against defendants. Pls. Mot. 40, 43-55. Both sides submitted economic evidence regarding the impact of the divestiture.

     Plaintiffs presented economic analysis suggesting that, even with the proposed divestiture, many geographic markets will remain presumptively unlawful. Of the markets that Dr. Hill found were presumptively unlawful using his HHI analysis, more than 113 do not include a single divested store. The proposed divestiture cannot offset anticompetitive harm in those markets. PX7004 ¶ 23. Dr. Hill found that, assuming a perfectly successful divestiture in which no sales are lost or stores closed as a result of the change, the merger would still be presumptively unlawful in 551 large format stores markets. PX7006 ¶ 153. This number goes up to 716 large format stores markets if it is assumed that the divested stores lose thirty percent of their sales. *Id.* ¶ 154. Dr. Hill's market concentration analysis found that, even assuming a perfectly successful divestiture, there are 230 large format store markets that would still be presumptively unlawful under the 2023 Merger Guidelines *and* for which the CMCR would be greater than five percent. PX7004 ¶¶ 201-202. For the supermarkets market, 1,002 markets would remain presumptively unlawful assuming a perfect divestiture. PX7006 at E-12, fig. 43. That number rises to 1,035 markets if ten percent of sales are lost, 1,276 markets if thirty percent of sales are lost, and 1,347 markets if fifty percent of sales are lost. *Id.* at E-19, fig. 51.

     Dr. Hill also considered the risk that some divested stores close after the divestiture. If thirty percent of divested stores close, 710 large format store markets are presumptively unlawful. If fifty percent of divested stores close, that number rises to 860 smarkets. PX7006 ¶¶ 157-58. Plaintiffs note that a fifty percent store closure rate corresponds roughly to the closure rate of stores divested as part of the

merger of Albertsons and Safeway. *Id.* ¶ 158. For the supermarkets market, 1,310 markets are presumptively unlawful assuming ten percent of stores close, 1,410 are presumptively unlawful assuming thirty percent of stores close, and 1,520 are presumptively unlawful assuming fifty percent of stores close. *Id.* at E-10, fig. 52.

Dr. Israel's initial market concentration calculations account for a perfectly functioning divestiture. Using his EGK markets, he found that sixty-five supermarkets markets were presumptively unlawful under the 2010 Merger Guidelines, while 120 markets were presumptively unlawful under the 2023 Merger Guidelines. DX2623 at 116, tbl. 6. Looking at plaintiffs' large format stores market, Dr. Israel found twenty-two were presumptively unlawful under the 2010 Merger Guidelines, while 231 were presumptively unlawful under the 2023 Merger Guidelines. *Id.*

This evidence, on its own, is sufficient to find that the divestiture will not mitigate the merger's anticompetitive effect such that it is no longer likely to substantially lessen competition.

### ii.    *Scope of the Divestiture*

There are other reasons to be concerned about the potential remedy provided by the proposed divestiture even in markets where a perfect divestiture would not have a presumptively unlawful market share. The merger agreement contemplates a divestiture of 579 stores to C&S. These 579 stores, combined with C&S' existing twenty-five stores, would create a significantly smaller firm than either defendant pre-merger. This fact, on its own, raises concerns about C&S' ability to replace the overall competitive intensity lost as the result of a merger of two significantly larger firms.

As previously discussed, C&S would receive a mix of stores, banners, private labels, and other assets. The divestiture package does not represent a standalone, fully functioning company but rather, as C&S' chief executive officer described it, the "assets" and "supporting assets" that "will create a company." Tr. 1178:7-9 (Winn). Under the terms of the TSA, C&S will receive support as it integrates new stores and assets and has deadlines by which it must accomplish this. For example, the TSA gives C&S thirty-six months to change the banner, or "rebanner," stores at locations where it does not retain the current banner. DX2238 at 13.

C&S will receive a subset of defendants' stores, representing a mix of banners. While C&S will own or have license to use a selection of defendants' current banners, those banners do not necessarily match with those on the stores it is receiving. As a result, C&S will need to rebanner 286 of the 579 divested stores. Tr. 1028:11-16 (McGowan). In ten states and the District of Columbia in which C&S would acquire stores, it would not acquire any banner currently present in those states and would need to introduce a new banner. *Id.* at 1040:2-6 (Mcgowan). C&S has hired consultants to research markets and plan to select the appropriate banner for the stores that require rebannering. *Id.* at 1059:20-1060:4 (McGowan). C&S was advised by outside consultants that there are revenue risks associated with rebannering. *Id.* at 1092:23-1095:21 (Florenz).

Plaintiffs' expert in retail operations and consumer shopping behavior, Dr. Edward Fox, explained why rebannering is risky. A banner holds a retailer's equity, including brand loyalty and name awareness. PX7002 ¶ 26. Dr. Fox determined that C&S planned to rebanner 129 stores with banners that have limited consumer awareness in their local areas and opined that rebannering to little-known banners can harm a store's ability to compete. *Id.* ¶ 27; *see also* Tr. 961:8-18 (Knopf) ("The stores are community and neighborhood centric in nature, and the customer has come to have a relationship with those stores, the people in those stores, and the nature of that brand. And changing the name on a building is very, very, complicated, and it's very risky, because the incumbent customer will not recognize it."). Not all banners have the same level of loyalty and brand awareness, and plaintiffs suggested that C&S may not be receiving the most desirable banners. *See, e.g.*, PX3699 (messages between C&S employees asking "Have you looked into the market perception of QFC? Everyone on those forums says there [*sic*] pricing is terrible and they have a bad reputation because of it.").

Private label brands are also subject to the TSA. C&S will have limited use of the Albertsons Signature and O Organics private label brands in defendants' portfolios for a total of four years: two years at cost, and two years at a markup price. PX7002 at 8, fig. 3. It will have access to Kroger private labels for a slightly shorter period. *Id.* After the TSA window ends, C&S will lose access to many private label brands that Kroger and Albertsons customers are familiar with. It will be required to replace all private

label products at the acquired QFC, Mariano's, and Harris Teeter stores. Tr. 1016:9-13 (McGowan). In QFC stores, for example, C&S plans to remove the Kroger private label products at the expiration of their service period, replace them with Albertsons private label products, and finally replace those with new C&S private label products. *Id.* at 1083:1-16 (Florenz).

As witnesses emphasized, private label brand equity is important to grocery retailers. Private label products generate higher margins than national brand products and are generally exclusive to a particular retailer. PX7002 ¶ 28. Dr. Fox opined that C&S' reliance on Kroger and Albertsons brands during the transition period would render the private label products less valuable to C&S because they would not be exclusive and because C&S will lack control over the offerings. *Id.* Replacing all of the private label SKUs during the transition period, and convincing customers to buy the new products, would require a private label program expansion that is "unprecedented in scale . . . and scope." *Id.* The Court heard testimony that, when one competitor offers a new private label product (in this instance, through the Topco consortium rather than in-house production), it could take between a year to a year and a half to "really get a following." Tr. 183:7-25 (Van Helden). The process is relatively faster when customers are already familiar with the brand, but when a new brand is offered, "that's a harder transition." *Id.* At Stater Brothers, the transition from a familiar private label to a new offering results in a fifteen percent decrease in sales. *Id.* at 187:24-188:3 (Van Helden).

C&S will receive a "tech stack clone," or a copy of the IT systems currently used in Albertsons store. Tr. 1081:13-18 (Florenz). The tech stack clone is slated to become available twelve months from the close of the divestiture deal and will be available to C&S for a period of four years. *Id.* at 1082:2-4; 1084:16-19 (Florenz). During that time, C&S intends to develop its own tech stack to which it can migrate at the end of the transition period. *Id.* at 1085:23-1086:3 (Florenz). C&S believes that the tech stack will be a "powerful" asset because "the stores aren't going to have to change their processes and the way they go about doing business," although the ninety-four Kroger stores included in the divestiture package will be required to switch to the Albertsons tech stack. *Id.* at 1152:23-1153:3; 1156:20-24 (Florenz).

Because defendants currently hold all collected data and loyalty program records, the TSA grants C&S temporary rights to loyalty programs for a period of six to twelve months. *Id.* at 1020:24-1021:5 (McGowan). After that period, customers who shop at divested stores will no longer be able to use those loyalty programs, C&S will have to implement its own program, and customers must then re-enroll in the new program. The divestiture agreement also conveys three years of raw transaction data for customers who shop at the divested stores. *Id.* at 1083:21-1084:2 (Florenz). Dr. Fox testified that because defendants will have a more robust loyalty program, customer data, and targeted advertising, C&S is vulnerable to having defendants target its customers after the merger. PX7002 ¶ 29.

The divestiture agreement and TSA convey distribution centers in four states. As a wholesale business, C&S benefits from its existing distribution network and experience. Dr. Fox found, however, that C&S would need to supplement its distribution centers to effectively meet the needs of the divested stores. *Id.* ¶ 32. C&S intends to build warehouses in Alaska, Southern California, and Illinois, for example, to support the expanded business. Tr. 1136:11-14 (Florenz). It will receive distribution services for up to three years under the TSA because it is not receiving all of the distribution centers that currently serve the divestiture stores. *Id.* at 1193:24-1194:5 (Winn).

The divestiture agreement and TSA do not convey or provide support for other aspects of grocery retail. C&S currently does not have any retail media capabilities, for example, and will not receive any as part of the divestiture. *Id.* at 1023:16-1024:17 (McGowan). C&S anticipates that it will require three years to set up mature retail media capabilities. *Id.*

C&S has clearly planned extensively for a complex transition process and intends to build out its capacities to effectively operate the divested stores. The structure of the divestiture package, however, creates many risks for C&S that could make it difficult to compete. It is difficult to see how certain of C&S' plans, such as rebannering about half the stores and introducing new private label items, which is effectively the same as opening a new, unfamiliar grocery store in the eyes of consumers, could maintain the current level of competition provided by stores with familiar banners and products.

###### iii. Experience of the Divestiture Buyer

There are serious concerns about C&S' ability to run a large-scale retail grocery business that can successfully compete against the proposed merged business, as would be required to offset the competitive harm of the merger. C&S does not have any experience running a large portfolio of retail grocery businesses. Although C&S would acquire 579 stores, which include hundreds of pharmacies and fuel centers, C&S currently operates twenty-five stores, one pharmacy, and no fuel centers. *Id.* at 1019:20-1020:18 (McGowan). Its past divestiture purchases have not been successful. Between 2001 and 2012, C&S acquired 334 retail grocery stores. Only three of those remained by November 2012. PX7004 ¶ 230. This includes the ninety-eight stores acquired from Bi-Lo and Winn Dixie, which were all closed or sold off by the end of 2012.

The evidence available suggests that C&S' current stores are performing below expectations. *See* PX7004 ¶¶ 225-227, fig. 56. C&S closed a Piggly Wiggly branch in Wisconsin about eighteen months ago that was not generating sufficient income to cover its operating expenses and "needed a tremendous amount of capital." Tr. 992:4-18 (McGowan). All of the Piggly Wiggly stores taken together, and approximately half of the individual stores, were not on track to meet their fiscal year 2024 budget expectations. *Id.* at 992:19-993:6 (McGowan). The Grand Union stores have failed to meet the sales projected at the time of purchase. *Id.* at 994:10-15 (McGowan). The Grand Union stores' EBITDA (earnings before interest, taxes, depreciation, and amortization, a general measure of profitability) has been consistently negative since purchase. *Id.* at 997:18-998:12 (McGowan); PX3515 at 019. These struggles raise concerns about the ability of C&S to successfully compete with the merged firm. *See Aetna Inc.*, 240 F. Supp. 3d at 72-73 (finding that the proposed divestiture buyer's past failures to operate in the market "raise[] concerns about its ability to successfully compete following the divestiture.").

C&S has an internal team dedicated to private label products that supports its wholesale and retail business. Tr. 1014:4-9 (McGowan). It provides approximately 1,300 "Best Yet" private label SKUs that are sold in Grand Union and Piggly Wiggly stores and to its wholesale customers. *Id.* at 1014:21-13 (McGowan). C&S' current private label sales are a small fraction of the current sales at the stores slated

for divestiture; while C&S' wholesale business ███████████ in private label sales, ███████

███████████████████████████████████ private label sales. ███████████

██. It does not have any private label manufacturing facilities. Tr. 1015:31-1016:1 (McGowan). While C&S has experience and organizational capacity to offer private label products, it is much more limited than what the divestiture stores currently demand.

Defendants' expert in corporate mergers, acquisitions, and divestitures, Daniel Galante, testified that despite C&S' past performance in the retail industry, it is an "extremely strong buyer of this divested business." *Id.* at 3148:7-8 (Galante); *see* DX2738. He raised as an example of C&S' preparation its "conservative deal model," which evaluates divestiture-related risks, quantifies them, and forecasts business outcomes. Tr. 1108:20-109:5 (Florenz); *see* PX3602. C&S forecasts that annual revenue will grow at an average of one percent per year over the first five years of ownership. Tr. 1116:8-11 (Florenz). The parties disputed the accuracy of the deal model and whether it accounts for all of the risks that may lead to temporary or permanent loss of sales. Plaintiffs note, for example, that although C&S has included costs related to loss of TSA services in the model, it does not model an impact on sales for those changes, including for rebannering in individual states or for changing private label products. *Id.* at 1142:4-7; 1146:15-21 (Florenz). Mr. Galante's findings, and the parties dispute about the deal model, focus on C&S' diligence. While financial diligence is very important for any divestiture buyer, the diligence findings (and the parties' dispute about their accuracy) are not entirely on point. The question is whether the divestiture can restore competitive intensity, including by operating the divested stores at a similar competitive intensity, not whether the buyer has adequately forecast risks to competition such that it can operate financially.

About 1,000 Albertsons retail division employees have agreed to transfer to C&S following the divestiture, most notably Susan Morris, Albertsons' current chief operating officer, and they bring with them skill and experience. *See id.* at 1239:21-23 (Winn); 1902:7-21 (Morris). Ms. Morris, wo would serve as president and chief operating officer of C&S' retail division, has experience with divestiture integrations from her time working on Albertson's acquisitions of SuperValu and Safeway. *Id.* The participation of

experienced retail employees mitigates some of the risk that C&S faces by entering into the retail business. Their presence, however, does not fully mitigate C&S' inexperience and lack of success in grocery retail and cannot overcome the difficulties inherent to the selection of assets chosen and the structure of the TSA. The transfer of numerous Albertsons executives also contributes to the perception that C&S will not be truly independent of defendants for some period of time after the sale.

#### iv.    Independence of the Divestiture Buyer

C&S would remain interdependent with the merged firm for many years as a result of the TSA. The scope of the TSA is broad in both services and time. This poses a significant issue for the success of the divestiture, as "'curative divestitures' must be made to a new competitor that is 'in fact ... a willing, independent competitor capable of effective production in the . . . market.'" *CCC Holdings Inc.*, 605 F. Supp. 2d at 59 (quoting *White Consol. Indus. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir.1986)). Of particular concern is that Kroger, a competitor, will provide sales forecasting data and a base pricing plan to C&S for a period of time during the transition. C&S is permitted to adjust prices but must do so by instructing Kroger's "clean room" to execute pricing changes. Tr. 1010:6-23 (McGowan). "[I]t is a problem to allow continuing relationships between the seller and buyer of divested assets after divestiture, such as a supply arrangement or technical assistance requirement, which may increase the buyer's vulnerability to the seller's behavior." *Id.* (internal quotation marks and citation omitted); *see also Aetna Inc.*, 240 F. Supp. 3d at 71 ("Moreover, while the ASA gives [the divestiture buyer] some time to build its internal capabilities [and its provider networks], the ASA does not remedy [the divestiture buyer's] deficiencies. The Court will not rely too heavily on the [divestiture buyer], because Aetna and Humana have no incentive to provide any assistance beyond the bare minimum during this period, lest they create too powerful a competitor."); *Sysco Corp.*, 113 F. Supp. 3d at 78-79 (finding that a divestiture would not remedy the anticompetitive effects of a merger in part because the divesture buyer would not be a "truly independent competitor" due to its reliance on the merged firm to license it private label products for three years and database use for five years under a transition services agreement).

##### v.     Purchase Price

C&S has agreed to purchase the divested stores and assets for $2.9 billion.  Tr. 1228:9-10 (Winn).  C&S intends to finance the purchase with $500 million from the Cohen family, which owns C&S; $400 million from an investor, SoftBank; and $2 billion in loans.  *Id.* at 1228:11-18 (Winn).

Plaintiffs argue that this is a low purchase price that does not motivate C&S to successfully run the stores, as it could recoup its investment even if it loses sales.  Pls. Mot. 42.  Plaintiffs suggested that, given C&S' history of purchasing and selling grocery stores, C&S may plan to sell the stores while retaining assets, particularly related to its distribution network, that will be useful to its primary wholesale business.  *See, e.g.,* PX13034 (C&S internal communications regarding the Price Chopper/Tops divestiture stating "right now I think we should buy all the tops divestiture stores lol . . . I figure if we buy them, then they are happy and you could spend a year or so finding other buyers" and "yep.  We would lose money on the retail, take on the lease liability and any pension/union issues, but make out on wholesale side.").  Defendants counter that flipping the grocery stores would not be logical or make good business sense because the stores are worth only $2 billion, meaning C&S would lose $900 million in such a sale.  Tr. 1251:7-24 (Winn).

##### vi.     Conclusion

There is ample evidence that the divestiture is not sufficient in scale to adequately compete with the merged firm and is structured in a way that will significantly disadvantage C&S as a competitor.  C&S' history of unsuccessful grocery store ventures and its continuing dependence on defendants throughout the TSA period also suggest that the divestiture will not adequately restore competition.  The deficiencies in the divestiture scope and structure create a risk that some or all of the divested stores will lose sales or close, as has happened in past C&S acquisitions.  While many markets remain presumptively anticompetitive assuming the divestiture functions perfectly, a relatively small loss of sales or closure of stores short of a failure would still significantly increase the number of presumptively unlawful markets.  It is unlikely that the proposed divestiture would sufficiently mitigate the anticompetitive effects of the merger.

54

* * *

Considering the totality of the evidence, defendants' rebuttal is not sufficient to overcome the presumption of a substantial lessening of competition.

4. *Conclusion*

Plaintiffs have successfully established that the "supermarkets" and "large format stores" markets are relevant antitrust markets and that the proposed merger would substantially lessen competition in those markets due to the resulting changes in market concentration and loss of head-to-head competition. Defendants' rebuttal evidence is not sufficient to overcome plaintiffs' *prima facie* case. For these reasons, plaintiffs have met their burden of persuasion and are likely to succeed on the merits in the administrative proceeding.

C. **Labor Markets**

Plaintiffs allege that the proposed merger will substantially lessen competition for union grocery store labor. The parties dispute whether the relatively novel labor market theory is cognizable under the Clayton Act.

The 2023 Merger Guidelines introduced the consideration of labor markets as a relevant antitrust market. They suggest that a merger that substantially lessens competition for workers may result in "lower wages or slow wage growth, worsen benefits or working conditions, or result in other degradations of workplace quality" and that evidence that a merger may have any of these effects demonstrates substantial competition between firms for labor. 2023 Merger Guidelines § 2.10. Although the inclusion of workers in the 2023 Merger Guidelines is new, the concept of antitrust protections that extend to workers, not just consumers, is not. *See Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.") (internal citations omitted).

Labor markets are cognizable markets under the Sherman Act. *See Agnew v. Nat'l*

*Collegiate Athletic Ass'n*, 683 F.3d 328, 346 (7th Cir. 2012). There has been a recent trend in applying antitrust protections to the labor market of college student-athletes. In *National Collegiate Athletic Association v. Alston*, the Supreme Court upheld a preliminary injunction against certain restrictions on the ability of student-athletes to earn compensation. 594 U.S. 69, 107 (2021). The Northern District of West Virginia relied on *Alston* in its decision to temporarily enjoin the NCAA from enforcing transfer rules that prohibit an athlete from playing following a second transfer under Section 1 of the Sherman Act, based in part on a finding that the transfer rules harmed the labor market of student-athletes, who "are situated no differently than any other worker in an employment context but for the NCAA declaring so by corporate fiat." *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 590-91, 594, 596 (N.D.W. Va. 2023).

At least one recent horizontal merger case supports enforcement on the basis of reduced labor competition. In *Bertelsmann*, the court enjoined a proposed merger between two publishing houses based in part upon a finding that the merged firm would be able and incentivized to pay smaller advances to authors as a result of reduced competition. 646 F. Supp. 3d at 40-42. It treated authors as sellers or an input market in an analogous monopsony analysis, which considers whether reduced competition from a merger would harm sellers, rather than consumers.

Defendants argue that under the plain text of the Clayton Act, 15 U.S.C. § 17, which states that "[t]he labor of human being is not a commodity or article of commerce," the Act should not apply to labor markets. Defs. Resp. 42. That provision goes on to explain that antitrust laws shall not be used to forbid or constrain the existence of labor unions or their bargaining activities, given Congress' intent that antitrust law not be used to enjoin union activity. *See Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100*, 421 U.S. 616, 621-22 (1975) ("These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws."); *see also Drabinsky v. Actors' Equity Ass'n*, 106 F.4th 206, 212-13 (2d Cir. 2024) (providing a brief history of the exemption of union activity from antitrust law). "It is well settled that exemptions from the antitrust laws are to be narrowly construed." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979). This provision has not been construed by other

courts to prohibit the consideration of labor markets in horizontal merger analysis. Defendants' proffered cases relating to the injunction of labor activity or the application of labor law in the antitrust context are inapposite. Plaintiffs do not seek to regulate grocery unions or union activity; they wish to enforce antitrust law based, in part, on a determination that reduced competition would harm union grocery workers.

In the alternative, defendants argue that the labor theory is not cognizable because it falls into an implicit antitrust exemption for labor activity. Defs. Resp. 42-43. The Supreme Court has recognized "that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." *Connell Constr. Co.*, 421 U.S. at 622. This exemption has often been applied to protect restrictive agreements between professional athlete unions and their leagues that might otherwise be unlawful under the Sherman Act. *See O.M. by & through Moultrie v. Nat'l Women's Soccer League, LLC*, 541 F. Supp. 3d 1171, 1182 (D. Or. 2021) (collecting cases). The implicit exemption for labor activity does not apply here, where there is no attempt to circumvent labor law by using antitrust law to regulate an agreement between union and employer.

The Court does not need to reach the labor theory of competition because plaintiffs have met their burden regarding consumer competition. And, given that the FTC only recently included labor markets in the Merger Guidelines, the parties' arguments are understandably less developed than those regarding anticompetitive harm to consumers. Despite this, the Court provides a brief analysis of the parties' arguments. There is no apparent exemption or prohibition against considering the labor theory and plaintiffs present a compelling and logical case for applying traditional antitrust analysis to labor markets. However, the limited evidence presented at this time is not sufficient to independently support a preliminary injunction.

*1.    Market Definition*

a.    Product Market

Going through a process analogous to that of the consumer market, plaintiffs argue that the

"product" market of "union grocery labor" is the relevant market for antitrust analysis.  Pls. Mot. 33.  Just as consumers have product preferences and will only treat some products as reasonable substitutes that meet their needs, workers have employment preferences that can only be satisfied with certain jobs.  Applying the *Brown Shoe* indicia, plaintiffs assert that union grocery labor is a submarket that has distinct characteristics, industry recognition, and pricing that distinguish it from the labor market writ large.  *Id.*

The Court heard testimony that union grocery workers receive wages and benefits that are distinct from those offered to non-union grocery workers as a result of their CBAs, to which non-union grocery workers are not party.  *See, e.g.*, Tr. 196:14-197:19 (Van Helden) (testifying that union employees receive better wages, health and welfare benefits, pensions, representation during termination proceedings, and accrue seniority preference for scheduling).  Some CBAs covering union grocery workers give workers seniority or credit for past grocery industry experience, permitting them to maintain their seniority when moving between employers.  PX7004 ¶ 245.  They often include multi-employer pension and healthcare plans, which means that a union grocery worker can retain and contribute to their health and pension benefits when moving between employers who participate in the same plan.  *Id.* ¶ 244.  CBAs offer additional protections in the form of mandatory bargaining subjects.  For example, many Kroger CBAs mandate that Kroger cannot unilaterally change a union worker's premium pay or discharge a union worker without good cause.  Tr. 599:17-19 (McPherson).  Nonunion workers do not have these protections.  *Id.*

The parties presented conflicting expert testimony on whether union compensation structures result in meaningfully different compensation for union and non-union workers.  Dr. Justin McCrary, defendants' expert on antitrust labor economics, found that union grocery workers at Kroger and Albertsons are not paid a higher hourly wage than non-union workers.  DX2496 ¶¶ 126-28.  Dr. Orley Ashenfelter, an expert on labor economics, opined that Dr. McCrary's analysis was incomplete because it looked only at hourly wages.  It ignores other important factors related to compensation: union grocery workers work more hours than non-union workers, earn a higher annual gross pay as a result, and receive greater total compensation when including benefits like health insurance, retirement plans and pensions, minimum hours guarantees, and vacation and sick pay.  PX7010 ¶ 15.  Dr. Ashenfelter found that union

grocery workers, for example, worked on average fifteen percent more hours and twenty percent more overtime hours, resulting in thirteen percent more in total pay that non-union grocery workers. *Id*. ¶¶ 20-23. Similarly, defendants' stores with unionized workers have healthcare costs that are eighteen percent higher, pension costs that are twenty-six percent higher, holiday pay that is nineteen percent higher, and vacation pay that is eleven percent higher than non-union stores, although Dr. Ashenfelter identified no statistically significant difference in sick pay. *Id*. ¶ 32. These calculations suggest that union grocery compensation is meaningfully different, and higher, than non-union grocery compensation.

Defendants emphasized that non-wage differences were less important to union grocery workers, which unions disputed. *See, e.g.*, Tr. 648:19-649:1 (McPherson) (Kroger executive testifying that "the driving discussion at the bargaining table is wages."); *c.f.* 677:11-17 (Clay) (President of UFCW Local 555 testifying that at bargaining he is "very concerned about health and welfare coverage and pension coverage; and then, you know, protections in the workplace for our members as well.").

Plaintiffs argue that union grocery workers are also different from workers in non-grocery retail jobs because they require different skills and experiences and because union grocery workers prefer to work in grocery jobs. Pls. Mot. 34-35. There is evidence that union grocery workers have distinct characteristics, although their potential roles within the store may vary greatly. They may receive specialized training and accreditation to work as a meat cutter or obtain specialized food handling training and product knowledge to work in a bakery, as a cake decorator, or in the deli. Tr. 193:13-195:1 (Van Helden); 750:21-751:6 (Zinder). Meat cutters, deli department clerks, bakery heads, and other similar roles are generally trained and promoted internally rather than brought in as new hires because of their experience. *Id.* 667:14-25 (McPherson). Department managers also have significant experience and responsibility. *Id.* Courtesy clerks and general merchandise clerks, who staff the floor of the store, do not require the same specialized training.

Finally, it is obvious that there is industry recognition of union grocery workers. Employers choose whether to hire union or non-union workers, sometimes categorically and sometimes on a store-by-store basis. They recognize the difference by engaging in bargaining with the unions, offering

different terms of employment than they do to non-union employees, and honoring the resulting CBAs.

Dr. McCrary opined that the proposed union grocery labor market excludes non-grocery employment options that are reasonably interchangeable substitutes. He found that there was a high level of substitution between defendants' union grocery positions and non-union and non-grocery positions, and that workers employed in union grocery positions are more likely to move to and from jobs outside of the union grocery market at employers like Amazon, Starbucks, FedEx, and Home Depot. DX2496 ¶ 22. He attributed this in part to the fact that "general skills" like customer service and reliability required by union grocery jobs are often valued in other retail employment settings, both union and non-union, and that defendants generally do not have any educational requirements. Tr. 3065:11-3068:12 (McCrary); DX2496 ¶¶ 38-40; *see also* Tr. 2515:1-9 (Dosenbach) ("We are looking at people with all types of backgrounds. When you look at it, we are hiring entry-level positions. So we're not looking for any specific experience."). Dr. McCrary reasoned that because slightly over half of defendants' employees terminate their employment within six months and about seventy percent leave within a year, they may not value the particular characteristics offered by union grocery work, such as accrual of seniority. Tr. 3072: 8-3075:14 (McCrary).

Much like with cross-shopping and share of wallet spending in the consumer product markets, the fact that some workers move between union grocery and non-union or non-grocery jobs does not necessarily indicate that a submarket for union grocery labor does not exist. The limited data available to the Court makes it difficult to assess how meaningful the movement between jobs is and what motivates it. Workers may, as Dr. McCrary's report suggests, move between retail jobs without regard for the type of retailer or the compensation structure because it suits their skills and qualifications. Workers may accept a retail job to accrue customer service experience, then move into a better-compensated union grocery job when one becomes available in their market. Workers may move between union grocery jobs and non-union grocery jobs depending on local staffing needs; there may not always be sufficient, consistent employment opportunities for all workers who prefer union grocery work. Based on the testimony of grocery management and union leaders, it appeared that there may be a core of more senior, long-term union grocery workers who place more importance on the distinct characteristics of union grocery work

than shorter-term, more junior workers. *See, e.g.*, Tr. 750:5-12 (Zinder) (President of UFCW Local 324 testifying that senior employees "vest in their pensions. They get the most affordable healthcare benefits. They've got a certain number of holidays and vacation days. So that's all based on seniority. So the longer they stay, the more they're attached to their company because they have all these benefits that were based on years of service.").

Although union grocery labor encompasses a range of jobs from entry-level courtesy clerks who may have shorter stints of employment to career meat cutters, bakers, and florists with training and expertise, the *Brown Shoe* indicia suggest that union grocery jobs are a distinct market. Despite competition for employees between union and non-union employers, and between grocery retailers and other businesses, it is clear that at least some workers prefer union grocery work because of its distinct wages and benefits, seniority accrual, and an interest in customer service or the skills needed to operate a specialized department. For those workers, union grocery jobs are "uniquely attractive." *Whole Foods Mkt.*, 548 F.3d at 1039 (internal citation marks and quotation omitted).

b. Geographic Market

Plaintiffs propose a geographic market defined by the coverage of each CBA negotiated between defendants and the relevant union. Defendants are party to, in total, approximately 720 CBAs, primarily with the United Food and Commercial Workers ("UFCW") as well as the International Brotherhood of Teamsters and the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union. DX2496 ¶ 58; Tr. 647:3-6 (McPherson). The "CBA areas," as plaintiffs refer to them, are intuitively sensible. CBA defines the wages, benefits, and other conditions of employment for a particular store or group of stores, and generally correlates to a particular geographic area of coverage. *See* Tr. 599:9-14 (McPherson).

Defendants argue that the CBA areas are arbitrary and does not capture the entire area in which union grocery workers might look for alternative employment. Defs. Resp. 45-46. The CBA areas vary in size, some covering a single store and others a broader region. At Kroger, CBAs can cover anywhere between a single store and 130 stores. Tr. 648:1-3 (McPherson). Much like shoppers, workers prefer not

to commute long distances, and defendants argue that the larger CBA areas covering, for example, entire metropolitan areas represent an unrealistic draw area for commute distance. DX2496 ¶ 69.

Defendants do not propose an alternative to the CBA areas. More uniform or granular geographic market would be preferable, but variation in the size of geographic markets is common and not disqualifying. CBAs indicate where union stores exist, set a consistent compensation scheme for the workers they encompass, and are focalized around a particular store or municipality. The CBA areas are a pragmatic way to capture where the effects of the merger would be felt by union grocery workers.

c.    Conclusion

Based on the limited evidence presented, the Court tentatively finds that the proposed union grocery labor market, including the CBA areas geographic market, is a plausible, relevant market for antitrust purposes. It represents a submarket of the larger pool of retail labor that has industry recognition and offers distinct compensation and benefits based on the CBA negotiated in each store, group of stores, or region. Given that this is a relatively unusual market definition, it lacks supporting economic analysis that would generally be undertaken to verify whether a market is appropriately bounded. However, the Court is not aware of any standard economic analysis used to measure employee diversion resulting from, for example, a hypothetical monopolist employer imposing a small but significant decrease in wages and benefits. The Court cannot demand that the parties undertake an analysis using economic models that do not exist. More robust economic analysis at a later stage of the proceedings could modify this preliminary finding.

2.    *Competitive Effects*

a.    Market Concentration

Plaintiffs argue that the merger would lead to presumptively unlawful concentration in the union grocery labor market by creating a single, dominant employer in many CBA areas. Pls. Mot. 36. While in the consumer context a more highly concentrated market would result in fewer stores competing to sell a product, in the labor context a more highly concentrated market would result in fewer employers competing for workers.

Dr. Hill calculated market shares, defined as the percentage of union workers employed, in the proposed markets in Washington, Oregon, California, and Colorado where defendants have overlapping CBA areas. Dr. Hill determined that defendants were the only "large union grocery employers" in many CBA areas and the merger would result in a high market share in those areas. PX7004 ¶ 255. Notably, Dr. Hill found that defendants were the only union grocery employer in the Colorado CBA areas, rending the post-merger firm a monopoly. *Id.* ¶ 256. In Southern California, multiple union locals jointly negotiate a single CBA. In that CBA area, the post-merged firm would have seventy-five percent of the union labor market share. *Id.* ¶ 257. In Oregon and Washington, the post-merged firm would have approximately sixty to seventy-five percent of the market share, depending on the CBA area. *Id.* ¶¶ 258-59.

Dr. McCrary conducted market share analysis for the CBA areas used by Dr. Hill but substituted a broader product market he describes as "grocery store occupations," which includes all cashiers, stockers and order fillers, food preparation workers, first-line supervisors of retail sales workers, hand packers and packagers, butchers and meat cutters, and bakers. DX2496 ¶ 164. He also looked at an even broader market he called "grocery-related occupations" that included the seven listed grocery store occupations plus the five closest similar occupations drawn from Bureau of Labor Statistics data. Taking into account the proposed divestiture, he found that the post-merger firm would not have an employment share greater than ten percent in any CBA area when considering the full panoply of grocery-related occupations, and not higher than thirty percent when considering just grocery store occupations. *Id.* ¶¶ 167-69.

Neither party calculated the HHI, explained how the presumptive thresholds set out in the Merger Guidelines should apply, or offered a particular market share percentage at which they believe the merger would substantially lessen competition.

b.     Elimination of Substantial Competition

Plaintiffs argue that defendants compete to hire and negotiate collective bargaining agreements with union grocery workers and the loss of this head-to-head labor competition would result in

a reduction in leverage for grocery unions during collective bargaining negotiations. Pls. Mot. 17. Defendants are the two largest employers of union grocery workers in the country and many of their competitors are non-union. A loss of leverage during collective bargaining negotiations would, presumably, lead to a worse outcome for union grocery workers in the terms of their CBAs, which include wages and other benefits.

Defendants monitor each other's union negotiations and sometimes try to hire each other's employees, suggesting that they view each other as strong competitors for hiring union grocery labor. *See, e.g.*, Tr. 1402:3-20 (Broderick); PX2395. Albertsons considers Kroger a "bargaining competitor" and the two compete for talent. Tr. 2538:9-21 (Dosenbach). At traditional supermarket Stater Brothers the main competition for recruiting and retaining workers is another unionized store, such as Albertsons, Vons, or Ralphs, because "[p]eople are looking for that level of pay and that level of benefits if they are working for one of those competitors." *Id.* at 195:2-10 (Van Helden). Stater Brothers distinguished, however, between courtesy clerks, who are generally younger and starting their first job, and other types of jobs within the store. *Id.* at 195:10-16 (Van Helden).

As detailed further in subsection C.2.c., when unions engage in bargaining with defendants simultaneously they may use one employer's proposal to extract a matching or improved proposal from a competitor employer. This is further evidence that defendants compete directly for union grocery workers.

c.      Discussion

Plaintiffs have established that the merger would increase the market concentration of union grocery workers in the four regions it analyzed and that defendants engage in head-to-head competition when hiring union grocery workers and negotiating CBAs. The key issue is whether these changes would substantially lessen competition for union grocery workers. The Court does not have HHI calculations or structural presumptions to apply that would indicate whether there is undue market concentration. Nor does it have economic analysis of whether the merged firm will have an incentive to reduce wages and benefits.

Plaintiffs' theory of lessened competition is that union grocery workers would lose

leverage and bargaining power in the face of a single merged firm.  In particular, they highlight the significance of the ability of unions to credibly threaten a strike, boycott, or other action against an employer.  Pls. Reply, ECF [384], at 17-18.  When unions strike, stores cannot operate normally, workers may leave, and the unions divert customers to an alternative union grocery store.  Pls. Proposed FOF & COL 46-47.  Similarly, when unions bargain with more than one employer, they may use an agreement with one employer to secure a similar promise from another, with the underlying threat that if a satisfactory agreement is not reached, employees can leave for a competitor union employer.  Employers are incentivized to meet bargaining demands to avoid these harms.  In a post-merger world, with increased market concentration and reduced head-to-head competition, plaintiffs argue that unions would not be able to engage in these tactics because there would be no alternative union grocery store.  With less leverage, and without the risk that a competitor could offer better compensation and attract away employees, an employer is not incentivized to meet a union's bargaining demands.  This could result in reduced wages and benefits.

Plaintiffs presented evidence that the major grocery unions engage in "whipsaw" bargaining and strikes against defendants.  In a whipsaw strike, unions negotiate with at least two employers at once.  A union may reach an agreement with one employer, then threaten to strike another bargaining employer if they don't offer the same terms.  Tr. 602:18-25 (McPherson).  A whipsaw strike is only possible if there are at least two unionized employers negotiating with a union.  *Id.* at 603:1-10 (McPherson).  There is evidence in the record that such tactics have been used, with success, against defendants.  In Portland, Oregon, UFCW Local 555 employed whipsaw tactics during bargaining in December 2021, when it negotiated with defendants separately.  UFCW Local 555 struck Kroger and directed customers to shop at Albertsons.  The strike concluded with "the biggest wage increase [the union] had seen with a major employer."  *Id.* at 687:24-689:19 (Clay).

Defendants are strongly incentivized to avoid a strike.  The Court heard testimony that a strike "would definitely have an impact on the market."  *Id.* at 538:4-9 (Huntington).  In December of 2021, for example, Fred Meyer workers threatened to go on strike in Portland, which Albertsons' then-Portland

division president viewed as a positive opportunity that would "deliver more sales and more customers to our stores." *Id.* at 539:17-20 (Huntington). Upon learning about the potential strike, he wrote, "[t]his would be massive for us if they actually went on strike…think COVID 2.0, but with the knowledge we already have under our belt." PX2448 at 001. Albertsons prepared an internal projection of substantial sales increases from customers diverted from Fred Meyer stores as a result of a strike. *See* PX2795. In January of 2022 Kroger workers went on strike in Denver for over a week. PX7004 ¶ 177. Albertsons' then-Portland division president offered to send assistance to the Denver division president to help with the influx of customers diverted from Kroger stores, writing "I'm assuming Kroger is still on strike in your market given the mass sales [increases]." PX12484. One nonparty grocery executive stated that "strike threats give unions leverage, although "[a] little less nowadays, because they do it all the time." Tr. 198:17-20 (Van Helden). He believed that a larger company, and particularly a company that has more than one CBA, has a better ability to withstand a strike, because it can spread losses in one store across the national market. *Id.* at 199:3-13 (Van Helden).

One way that defendants avoid the threat of strikes is by entering into mutual strike assistance agreement ("MSSA"). When employers enter into an MSSA they agree that if a union strikes one employer, the other employer will lock out their employees. *Id.* at 605:7-21 (McPherson). Kroger's Vice President of Associate and Labor Relations testified that MSSAs give employers leverage because unions do not want to risk having many or all of their employees out on strike at the same time and because they make strikes more costly. *Id.* at 606:2-15 (McPherson). Kroger sometimes tells unions it is discussing an MSSA even if it has not yet signed one because it provides a similar advantage. *Id.* at 607:4-6 (McPherson). Kroger sought to enter into an MSSA with Albertsons to avert UFCW Local 555's strike against it in 2019, but Albertsons refused, and the strike went ahead. *Id.* at 607:18-21 (McPherson). In Denver in late 2021 and early 2022, Kroger determined that UFCW Local 7 was attempting to whipsaw Kroger and Albertsons. Out of concern that this would result in more costly contracts, Kroger sought to enter into an MSSA with Albertsons. *Id.* at 609:4-613:3 (McPherson); *see* PX1033 (internal Kroger communication regarding MSSA negotiation with Albertsons stating "they are attempting to whipsaw our

two companies. If our two companies allow the UFCW to continue to leverage this strategy, as they recently did to both of us in Portland, then our expected settlements will be much greater than either of us planned. . . . we think entering into a[n MSSA] provides both companies with as much leverage as possible to avoid the UFCW's current whipsaw tactics.") Albertsons did not agree, and the union struck Kroger. Tr. 613:7-8 (McPherson).

Defendants argue that any loss of head-to-head competition or increase in market concentration would not lead to anticompetitive harm because defendants already can bargain together, effectively acting as a single bargaining entity, and enter into MSSAs. Defs. Resp. 46; *see, e.g.*, Tr. 600:19-20 (McPherson) (testifying that defendants engage in multi-employer and coordinated bargaining with each other). They emphasized that strikes are exceedingly uncommon and only one of many bargaining tactics in a union's toolkit. Tr. 655:6-10 (McPherson). Similarly, defendants argue that plaintiffs overstate the threat posed by a strike or the loss of leverage when negotiating with a single, rather than multiple, employers. Dr. McCrary stated that "bargaining with a larger firm merely raises the stakes of the negotiation for both the firm and the union" because "when more is at stake, the cost of not reaching an agreement goes up on both sides simultaneously, so neither side is necessarily disadvantaged." DX2496 ¶ 191.

Defendants' labor relations expert, Roger King, opined that, given the protections of the NLRA and the functioning of the NLRB, the merger would not harm union grocery workers and would, in fact, give unions greater bargaining power. Tr. 2835:12-2836:3 (King); *see* DX2740. His opinion was premised largely on the fact that the existing CBAs would be assumed by the merged firm or C&S and that union grocery workers would not lose any of the terms of the CBA or rights protected by the NLRA in the event of a merger. Tr. 2838:18-24 (King). It is of course the case that labor law would not change as a result of the merger, but that is not material to the issue at hand: whether a loss of competition would lead to reduced bargaining power. Mr. King's testimony was of limited utility given its focus on labor law itself, rather than relevant antitrust topics, and given his testimony that he is employed by the HR Policy Association, an association of grocery stores that includes Kroger, and would not take a legal position that

is adverse to its interests. *Id.* at 2892:16-22 (King).

Plaintiffs' argument that increased market concentration and loss of head-to-head-competition would result in decreased bargaining power, leading to worse CBA negotiation outcomes for workers, including reduced compensation, is plausible. Defendants seek an advantageous bargaining position, whether through the use of coordinated bargaining or MSSAs, to mitigate the harm that unions can cause with strikes and to resist union demands, including for increased compensation. With only one union employer in many markets, defendants would be in a relatively stronger, and union grocery workers in a relatively weaker, bargaining position. That argument is certainly more plausible than defendants' assertion that an increased concentration in union grocery employers and the loss of direct competition between Kroger and Albertsons would not change the balance of power at the bargaining table and, on the contrary, would be beneficial for union grocery workers. Both sides, however, offer primarily anecdotal testimony from union representatives and Kroger and Albertsons executives regarding past bargaining sessions and strikes. There is no economic modeling of how wages, benefits, and other compensation might change as a result of changes in bargaining power, either in absolute terms or relative to non-union grocery wages. Even if those calculations were available, plaintiffs have not explained what they believe would be a "substantial" reduction in competition. The Court simply lacks sufficient guidance on how the parties should measure changes and what changes would be meaningful.

At this stage, plaintiffs have not presented sufficient evidence to establish a *prima facie* case that the proposed merger will substantially lessen competition for union grocery labor. Accordingly, the Court need not reach defendants' rebuttal.

## D.    Equities

Courts must balance the likelihood of success against the equities on a sliding scale when deciding whether to grant a preliminary injunction. *Whole Foods Mkt*, 548 F.3d at 1035. When a plaintiff establishes a likelihood of success on the merits there is a presumption in favor of granting a preliminary injunction; however, the court must still weigh the public and private equities in the case. *Cardinal Health, Inc.*, 12 F. Supp. 2d at 66. "The principal public equity weighing in favor of issuance of preliminary

68

injunctive relief is the public interest in effective enforcement of the antitrust laws." *H.J. Heinz Co.*, 246 F.3d at 726. The private equities are considered, but "[t]he prevailing view" is that they afforded less weight than the public equities. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352 (3d Cir. 2016).

Because plaintiffs have established a likelihood of success on the merits, the public equities weigh in favor of granting the motion for preliminary injunction to effectively enforce the antitrust laws. As a result, defendants must show that "the equities weigh so much in their favor to deny the FTC the relief it seeks." *See Cardinal Health, Inc.*, 12 F. Supp. 2d at 66; *see also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981) ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger.").

Defendants argue that the public equities support permitting the merger to go forward because "[t]he merger will generate billions of dollars in synergies and substantial price reductions for consumers nationwide," and those lowered prices will be lost forever should the merger be enjoined. Defs. Resp. 47. As discussed above, the efficiencies permitting defendants' planned price investment are neither merger-specific nor verifiable, so there is no guarantee that they will result from the merger or that they could not be achieved in the absence of the merger. Similarly, the promise to make a price investment is not legally binding, and the Court must give limited weight to a non-binding promise made during these proceedings. Although defendants argue that these benefits would be lost forever, a preliminary injunction would only enjoin the merger pending the outcome of the administrative proceeding. Should the administrative law judge later find that the merger is permissible, defendants would have the choice to see the merger through and implement the price investments. *See Penn State Hershey Med. Ctr.*, 838 F.3d at 353 ("Nevertheless, even accepting the Hospitals' assertion that they would abandon the merger following issuance of the injunction, the result—that the public would be denied the procompetitive advantages of the merger—would be the Hospitals' doing. We see no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a FTC adjudication on the merits that finds the merger lawful.").

The administrative proceeding is still pending, and should the preliminary injunction be denied, defendants have expressed an intent to consummate the merger prior to the resolution of that proceeding. Without an injunction, the merger would be a *fait accompli*. Should the FTC later find that the merger is unlawful, effective remedies would be significantly more difficult to implement. *See FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966) ("If consummation of the merger is not restrained, the restoration of Bowman as an effective and viable competitor will obviously by [sic] impossible by the time a final order is entered. This is not unusual. Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture."); *Penn State Hershey Med. Ctr.*, 838 F.3d at 352-53 (citations omitted) ("[S]hould the Hospitals consummate the merger and the FTC subsequently determine that it is unlawful, divestiture would be the FTC's only remedy. At that point, since it is extraordinarily difficult to 'unscramble the egg,' 'it will be too late to preserve competition if no preliminary injunction has issued.'"). Given the high level of competition between defendants, it would be exceedingly difficult to preserve competition once competitively sensitive information has been exchanged between them and assets conveyed to C&S.

Although Albertsons did not raise a failed firm defense to plaintiffs' *prima facie* case, it warned throughout the proceedings that, without a buyer, "the next two, three years are going to be very different for all of us . . . It would mean thinking about assets that are not performing and making tough decisions about them; about businesses that are not performing and making tough decisions on them." Tr. 1727:1-1728:2 (Sankaran). Both defendants gestured toward a future in which they would not be able to compete against ever-growing Walmart, Amazon, or Costco. Without the scale afforded by the merger, defendants argue, it will be more difficult for traditional supermarkets to survive in the long term. Defs. FOF & COL ¶ 355. The overarching goals of antitrust law are not met, however, by permitting an otherwise unlawful merger in order to permit firms to compete with an industry giant. *See RSR Corp.*, 602 F.2d at 1325 ("[A]nticompetitive effects in one market cannot be offset by procompetitive effects in another market."); *Phila. Nat'l Bank*, 374 U.S. at 370 ("If anticompetitive effects in one market could be justified by procompetitive consequences in another, the logical upshot would be that every firm in an industry

70

could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader.").

The weighing of the equities favors granting the preliminary injunction. Although defendants may choose to abandon the merger because of the preliminary injunction, this order in no way forces them to do so, and leaves open the possibility that they may pursue the merger at a later date should it be deemed lawful in the administrative proceedings. An injunction simply pauses the merger. Any harms defendants experience as a result of the injunction do not overcome the strong public interest in the enforcement of antitrust law, especially given the difficulty in disentangling a premature merger.

## CONCLUSION

Plaintiffs are likely to succeed on the merits and the equities weigh in favor of an injunction. Accordingly, plaintiffs' motion for preliminary injunction is GRANTED. The proposed merger between defendants Kroger Company and Albertsons Companies, Inc. is enjoined pending the outcome of the administrative proceedings before the Federal Trade Commission.

IT IS SO ORDERED.

DATED this 10th day of December, 2024.

Adrienne Nelson
United States District Judge